959 A.2d 130

**HILLSMERE SHORES IMPROVEMENT ASSOCIATION, INC.**

v.

**D. Gregory SINGLETON, et al.**

**No. 1373 Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Oct. 30, 2008.

668

670

672

Michael J. Ragland, Sr. (Bell, Ragland & Gauges, PA, on the brief), Annapolis, MD, for Appellant.

William M. Simmons, Annapolis, MD, for Appellee.

Panel: HOLLANDER and ZARNOCH, JJ., and RAYMOND G. THIEME, JR., J. (retired, specially assigned).

HOLLANDER, Judge.

This matter, which is before us for the second time, concerns ownership of portions of a "Community Beach" within the Hillsmere Estates Subdivision (the "Subdivision"), located near Annapolis. *See Hillsmere Shores Improvement Ass'n, Inc. v. Singleton,* No. 763, Sept. Term 2004, 166 Md.App. 756, 762 (filed December 5, 2005) (*"Hillsmere I"*). Hillsmere Shores Improvement Association, Incorporated ("HSIA," "Hillsmere," or the "Association"), appellant, is the record owner of "community property" in the Subdivision, including the Community Beach, which lies along the shore of Duvall Creek, a tributary of the South River. Under deed covenants, all lot owners in the Subdivision have the right to use of community property. D. Gregory and Susan "Gerri" Singleton (the "Singletons"), Edward and Leah Hertz (the "Hertzes"), and Parviz Sahandy ("Sahandy"), appellees, are residents of the Subdivision; they own properties adjoining the Community Beach. In 2003, appellees filed quiet title actions against appellant, seeking a declaration that, by adverse possession, they had gained title to the portions of the Community Beach sitting between their respective lots and the water.[1]

---

**1.** Appellees are represented by the same attorney. Pursuant to a joint motion for the parties, the circuit court consolidated the three law suits. Ultimately, the court issued only one Order, which applied to all parties.

Following a remand in *Hillsmere I*, the Circuit Court for Anne Arundel County conducted a court trial in June 2007.[2] On July 19, 2007, the court issued a "Memorandum Opinion and Order," in which it determined that appellees were entitled to the disputed portions of the Community Beach, based on adverse possession. In a separate Order dated July 19, 2007, the court declared the rights of the parties.

Unhappy with the court's rulings, appellant noted this appeal. Hillsmere presents seven questions for our review, which we quote:

I. Did the trial court err in considering the appellees' subjective intent when determining whether appellees had recognized the title holder's rights?

II. Did the trial court err in not finding that the appellee, Dr. Sahandy, had renounced claims of adverse possession?

III. Did the trial court err in allowing the tacking of successive possessions?

IV. Did the trial court err in awarding appellees more land than they actually possessed?

V. Did the trial court err in denying the appellant's claim for sovereign immunity?

VI. Did the trial court err in finding that adverse possession could subdivide a single platted lot in violation of the Anne Arundel County Code?

VII. Did the trial court err in deciding that title to recreation areas may be taken from a community association by

---

2. In *Hillsmere I*, we vacated the circuit court's grant of summary judgment to appellees based on a failure to join necessary parties. *Hillsmere I*, slip op. at 55. Following the remand, appellees filed an Amended Complaint on June 6, 2006, naming the other lot owners in the Subdivision as additional defendants. Lien holders were later added as defendants. Many of the answers contain the following assertion, or one similar to it: "[We] make no claim to any portion of the Singleton, the Sahandy, or the Hertz disputed properties." According to the circuit court, "no other individual Defendants participated in the trial." Moreover, it does not appear that appellant renewed the counterclaim that was filed in connection with the initial suits.

adverse possession when the Anne Arundel County Code only allows a community association to hold title?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## I. FACTUAL AND PROCEDURAL SUMMARY[3]

### A. The Subdivision

The Subdivision was created in phases between 1952 and 1959 by a corporate developer, Hillsmere Estates, Inc. (the "Developer"). Appellees own three noncontiguous lots in the Subdivision that sit along the south side of East Bay View Drive, a street that consists of a row of homes comprising Lots 1–17 of Section 1, Block A of the Subdivision. In particular, the Singletons own Lot 9, at 117 East Bay View; the Hertzes own Lot 15, at 129 East Bay View; Sahandy owns Lot 17, at 133 East Bay View. Sahandy's property, at the east end of the row, is separated from Lot 18 by a twenty-foot-wide path (the "Path") that provides access from East Bay View Drive to a large area of the Community Beach, which includes a community pier. The Community Beach can also be accessed from East Bay View Drive at the west end of the row, where Hillsmere Drive terminates at its intersection with East Bay View. At the terminus of Hillsmere Drive, another large portion of the Community Beach, containing a playground, sits adjacent to Lot 1. The two larger portions of the Community Beach, one at the end of Hillsmere Drive and at the other the end of the Path, are connected to each other by a narrow strip of beach that runs behind and borders Lots 1–17, separating the rear property lines of those lots from the shoreline of Duvall Creek. The portions of this narrow strip that sit

---

3. Pursuant to Maryland Rule 8–501(g), the parties have provided a "Stipulated Statement Of The Facts (the "Stipulation")", in lieu of the "625 pages of Docket Entries, 200 pages of miscellaneous pleadings, over 400 pages of transcripts and over 120 pages of exhibits" generated in this suit. Our factual summary is drawn largely from the Stipulation, the exhibits at trial, as well as the circuit court's Memorandum Opinion and Order of July 19, 2007. We have also included portions of the procedural history recounted in *Hillsmere I.*

directly behind Lots 9, 15, and 17 are the disputed areas in this case.[4]

In May 1952, upon the platting of Section 1 of the Subdivision, the Developer executed a "Deed of Covenants, Restrictions and Conditions" (the "Deed of Covenants"), which was recorded in the land records of Anne Arundel County (the "County").[5] With respect to Section 1 of the Subdivision, the Deed of Covenants provided, in part:

4. A committee of the [Developer] shall approve the exterior plan and construction or any alterations of any building and the position of the building on the lot. No building shall be more than 2½ stories in height and no work shall commence on the construction of any buildings or dwellings until the proper plans have been filed and approved in writing by the [Developer]. No wood nor solid fence, signs, billboards or advertising matter shall be erected on any lot unless approved in writing by the [Developer].

\* \* \*

8. That nothing herein contained shall construe [sic] a dedication of any road, lake, pond, park, playground, wharf, pier, [or] community beach until such time as the [Developer] may dedicate or convey the roads, etc., to any public authority having the power to acquire same.

\* \* \*

11. All purchasers of waterfront property with riparian rights, agree not to erect any fences, piers, wharves or any obstructions to water rights without obtaining written permission from the [Developer].

\* \* \*

---

4. Recognizing that "a picture is worth a thousand words," we have appended to this opinion two exhibits that depict the various locations. As to the first exhibit, we have handwritten the names of the parties on their respective lots.

5. Upon the subdivision of Sections 2 and 3 in January 1955, the Developer executed and recorded another "Deed of Covenants, Restrictions and Conditions," which reproduced verbatim the relevant language of the 1952 Deed of Covenants.

16. All said covenants, restrictions and conditions are to run with the land and to be expressly recited by reference in all future conveyances.

In June 1965, the Subdivision was designated as the Hillsmere Estates Special Benefit District (the "District"). Pursuant to the Anne Arundel County Code ("County Code"), the designation of "Special Community Benefit District," County Code, § 4–7–204(cc) (2005, Mar. 2008 S–17 Supp.), permits the County to "furnish and provide special privileges or benefits to persons or property in the district[ ], and levy special taxes on property in the district[ ] receiving the special benefit to pay the costs of furnishing, providing, and maintaining the special privileges or benefits." *Id.,* § 4–7–202(a). Under County Code § 4–7–101(d), each special community benefit district is administered "by a civic or community association that is an incorporated association and that provides for membership for each property owner in the district." HSIA was established as the administrator of the District.

By a "Deed and Agreement" executed on July 9, 1965, the Developer conveyed to HSIA certain "parks, playgrounds, wharves, piers, [and] community beaches" in the Subdivision, including the Community Beach and the Path, for "the purpose of promoting . . . recreational, beneficial and civic interests of its members, and in general for the purpose of promoting and improving the welfare of said community." Further, the Deed and Agreement stated that the Community Beach was conveyed to the Association "for the purpose of holding and maintaining the same for the use of bona fide lot owners in Hillsmere Estates for recreation, play, sports and in general, as a beach area and boat park[.]" The Deed and Agreement also provided, in part:

TO HAVE AND TO HOLD the aforesaid parcels of land to and unto the proper use and benefit of the [appellant] *for the use and benefit of all Hillsmere lot owners, its successors and assigns,* in fee simple, for the uses and purposes and subject to the restrictions, conditions, and understanding as follows:

1. That the land, piers and all other properties and rights hereby conveyed shall be used and maintained exclusively and solely as a beach, boat park and recreational area and for no other use, interest or purpose whatever, by the [appellant] *for itself and all lot owners,* however, to be limited to lot owners of land within the boundaries of that area designated as "Hillsmere Estates" as shown on the aforesaid mentioned plats, . . . subject also to the following:

(a) That the [Developer], . . . its successors and assigns, does hereby reserve the right to grant the privilege of use of that portion of the land being hereby conveyed designated as Community Beach . . ., including the right of ingress and egress to and from the same, unto the owners and purchasers (including future purchasers) of any other land of the [Developer] its successors and assigns, whether now or hereafter sold or conveyed by the [Developer], lying within the boundaries of all that area designated in the aforesaid plats of Hillsmere Estates, the grant of such use to be in common with others to whom such rights may have been heretofore granted or hereafter by the [Developer].

2. That the [appellant], its successors and assigns, will enforce, administer, protect and defend the uses and purposes for which this grant is made as above set forth and would do any and all things which may be calculated to improve and to further the improvements of said property hereby conveyed for beach recreational areas, *and for no other use, intent or purpose whatsoever* . . .; and it further agrees to keep and maintain said land hereby conveyed in a reasonably clean, safe and proper condition in furtherance of the uses, purposes and objects of this grant.

3. That nothing herein contained shall be construed as to ptohibit [sic] the [appellant] from making such reasonable and proper charges, *to be determined by the lot owners in Hillsmere Estates* for the use of the property hereby conveyed. . . .

4. *That nothing herein shall be deemed to be intended to deprive the owners and residents of land within the boundaries of the area known as "Hillsmere Estates"* . . . *hereto-*

*fore purchased from the [Developer] and/or conveyed here-tofore by the [Developer], including any conveyance or conveyances executed by Hillsmere Estates, Inc., of any rights to the use of said "Community Beach" shown on said Plat of Hillsmere Estates, Section 1 aforesaid, and being conveyed hereunder as a community beach.*

\* \* \*

*6. That in the event the [appellant] shall, by the lawful action of its membership, or by operation of law, or otherwise, cease to exist as a corporate body, or should it abandon said property or fail to apply the same for the uses and purposes herein set forth, according to the terms of this agreement and such abandonment or failure shall continue for a period of six (6) months, then in that event, the [Developer], its successors and assigns, shall, after thirty (30) days notice to the [appellant] of its improper uses of the property hereby granted, shall then become reinvested with the fee simple title in and to all property conveyed hereunder ... as if this conveyance had never been made.... (Emphasis added).*

In the Stipulation, the parties state:

Although [appellant] has spent special tax dollars from the Hillsmere Estates Special Benefits District on the playground at the end of Hillsmere Drive, it is undisputed that the Appellant has not done any work or expended any tax dollars on those portions of the Community Beach which lie between the shoreline and the platted rear lot line[s] of the three Appellees.

[Appellees], or their predecessors, have blocked the properties at issue for in excess of 30 years with hedges, fences, and bulkheads, during which time they have treated the land as their properties, and the land has been treated by [appellant] and the neighborhood as property of [appellees].

Moreover, the parties agree that no question was raised as to the ownership of the disputed properties until after appellant commissioned a survey in 2001 (the "Meekins Survey"), " 'to determine exactly where [appellant's] land begins on each

lot.' " The Meekins Survey, completed in 2003, showed that Lots 1–17 extended only 150 feet from East Bay View Drive,[6] stopping short of the waterline by several feet, and that several of the owners of Lots 1–17 had been using portions of the Community Beach as their own property. The parties also agree that in 2003 appellant "asserted ownership to the [disputed] land ... for the first time and demanded by letter that [appellees] and others remove their fences and hedges...."

### B. The Singletons—Lot 9, 117 East Bay View

On August 6, 2003, the Singletons filed a "Complaint to Quiet Title," in which they claimed title by adverse possession to that portion of the Community Beach "lying between the Singleton Property and the waters of Duvall Creek and the South River, and bordered by an extension of the Singleton property lines to the waters of Duvall Creek and the South River" (the "Singleton Disputed Property"). As depicted on a "Special Purpose Plat: Area of Adverse Possession South of Lot 9," drafted by David M. Green and dated May 5, 2004 (the "Singleton Plat"), the area claimed by adverse possession consists of "0.1812 Acres MORE OR LESS" or "7894 Sq ft more or less."

The Singletons purchased Lot 9 in 1977. At that time, it was bounded along its west side by a hedge and fence running from the street to the shoreline, and by a "tall, mature hedge running down the [e]astern boundary of their property all the way to the water's edge." The deed to the Singletons from their grantors did not refer to the provisions of the Deed of Covenants. But, the parties agree that the Singletons "understood when they purchased their property that the boundaries ran from hedge to hedge and down to the water's edge."

In 1979, two years after the Singletons purchased Lot 9, Hurricane David caused substantial damage to the waterfront behind their lot. As a result, the Singletons decided to build a

---

**6.** Sahandy's lot, on the end of the row, is irregularly shaped and extends further than 150 feet on its east side, along the Path.

bulkhead. They hired a contractor, who obtained permits from both the County and appellant.[7] Appellant's letter of approval to the Singletons' contractor granted permission for "construction of the bulkhead, along the property line facing the South River."[8] Moreover, the minutes of the meeting of the HSIA Board (the "Board") on March 22, 1979, reflect that the matter was discussed. The minutes stated: "Mrs. Jeri [sic] Singleton requested permission to build *her bulkhead along the waterfront side of her property*," and noted that the Board "voted to approve the proposed construction of a bulkhead by Mr. and Mrs.... Singleton **on their property at 117 East Bay View Drive.**" (Italics added; boldface in Stipulation). Accordingly, the Singletons constructed a 4 to 4.5–foot–tall bulkhead along what they believed to be their boundary at the water's edge.

The Singletons built a swimming pool in 1980, which partially extended into the disputed area. In the same year, they took down the existing hedge along the eastern side of their property and replaced it with a new hedge and a fence. According to the parties, the Singletons installed the new fence because County law required the enclosure of the swimming pool. The Singletons did not alter the existing fence along the western side of the lot.

Further, the parties agree that, "[f]rom the time the Singletons purchased the property until the present, they maintained all of the area from the waterfront and bulkhead up to the street from fence to fence." The Stipulation adds: "The Singletons were the sole people to maintain the property all the way to the waters [sic] edge." Further, "[a]t no time did any other person maintain the property or contend they had

---

**7.** According to the stipulation, the "Hillsmere Rules" require a permit from appellant for any work requiring a County permit. The parties also agree that Covenant 11 of the Deed of Covenants requires any waterfront owner to obtain the Association's approval for construction of "fences, piers, wharves or any obstructions to water rights."

**8.** The Stipulation does not reflect the date of the letter. But, from the context, it appears that the letter was written in 1979.

an interest in any area lying between the fences or landward of the bulkhead." The first indication the Singletons had of appellant's claim to the disputed area was in 2002, shortly before the completion of the Meekins Survey.

### C. The Hertzes—Lot 15, 129 East Bay View

On September 18, 2003, the Hertzes filed a "Complaint to Quiet Title," seeking title by adverse possession to that portion of the Community Beach "lying between the Hertz Property and the waters of the mouth of the South River and bordered by an extension of the Hertz property lines to the waters of the mouth of the South River" (the "Hertz Disputed Property"). As depicted on a "Special Purpose Plat: Area of Adverse Possession South of Lot 15," drafted by David M. Green and dated May 5, 2004 (the "Hertz Plat"), the area claimed by adverse possession consisted of "0.0394 Acres more or less[.]"

Lot 15 was originally purchased from the Developer in 1955 by John and Betty Giacofci. According to the deposition of Mr. Giacofci, which was admitted into evidence at trial, the Giacofcis believed their property extended to the waterline, and they constructed a bulkhead along the waterline in 1960. In 1965, the Giacofcis purchased the neighboring lot, Lot 16, known as 131 East Bay View, from the Developer. It sits between Lot 15 and Sahandy's lot. Prior to 1970, the Giacofcis enclosed the two adjacent lots with hedges, including hedges on top of the bulkhead, and constructed a swimming pool on Lot 16. The Giacofcis used the combined lots within the hedges and bulkhead as their property, and never received any complaints concerning the location of the hedges or the bulkhead.

The Giacofcis sold the two lots in 1975 to the Thompsons. In turn, the Thompsons sold Lot 15 to the Hertzes in 1979. The deed for Lot 15 stated that the Hertzes took the property "SUBJECT to all easements, covenants and restrictions of record." The parties agree that "[t]he Hertzes understood that they were purchasing all the way to the bulkhead."

In 1979, after Hurricane David, the Hertzes rebuilt the bulkhead, which is over five feet in height. They cut out the middle of the hedge on top of the bulkhead in the early 1980s to provide access to the water. Also in the early 1980s, the Hertzes planted a hedge between their lot and Lot 16. At that point, Lot 15 was completely enclosed down to the bulkhead. Prior to 2002, when the Hertzes became aware that appellant was conducting the Meekins Survey, the Hertzes did not know that anyone else had a claim to any portion of the land between their hedges and landward of the bulkhead.

### D. Sahandy—Lot 17, 133 East Bay View

Sahandy[9] filed a "Complaint to Quiet Title" on August 14, 2003, claiming title by adverse possession to the portion of the Community Beach situated between the southern border of the Sahandy Property, the landscaping on the east and west sides of the Sahandy Property, and a bulkhead constructed at the water's edge of Duvall Creek (the "Sahandy Disputed Property"). As depicted on a "Special Purpose Plat: Area of Adverse Possession South of Lot 17," drafted by David M. Green and dated May 5, 2004 (the "Sahandy Plat"), the area consisted of "0.1030 Acres more or less" or "4486 Sq ft more or less."

Sahandy purchased Lot 17 in 1966. The deed by which Lot 17 was conveyed expressly recited that Sahandy took the property "in fee simple, SUBJECT, however, to [the Deed of Covenants]." At the time Sahandy purchased Lot 17, it was vacant and overgrown with vegetation. The portion of the Community Beach near the water was severely eroded and covered with debris. Shortly after purchasing the Property, Sahandy planted hedges along the eastern edge of his Property, running along the Path toward the community pier. At some point prior to 1970, the Giacofcis installed the hedge

---

9. The parties often refer to Sahandy as "Dr. Sahandy," without further detail. We know from exhibits in the record that he is a medical doctor.

along the eastern boundary of Lot 16, which bounded Sahandy's lot to the west.

Sahandy made several unsuccessful attempts to control the erosion of the shoreline behind his lot, which the parties describe as including "bayberry trees, jetties, tires filled with sand, rocks and other devices." Because HSIA was also suffering erosion of the larger portion of the Community Beach and the community pier adjacent to Sahandy's lot to the east, the Association decided to install a bulkhead in 1973. Sahandy asked appellant to consider extending the proposed bulkhead across the back of his lot to connect with the bulkhead behind lots 15 and 16, which had been installed by the Giacofcis. The Board denied his request, because it was unwilling to do any work on "private property."

Appellant constructed its bulkhead along the community pier in late 1973 or 1974. Sahandy then applied for permits to install his own bulkhead behind his lot and to backfill the eroded area behind the proposed bulkhead. As part of the permitting process, appellant reviewed Sahandy's request. The minutes of the Board's meeting on February 5, 1974, reflect that a letter was sent to Sahandy "stating that [appellant] had no objection to [the] bulkhead he plans to build *on his property*." (Emphasis added). Accordingly, Sahandy constructed a bulkhead, connecting it to the Giacofci bulkhead to the west, and to appellant's bulkhead along the community pier to the east. He also installed bushes along the top of his newly-constructed bulkhead. In addition, Sahandy backfilled the eroded land behind the bulkhead and planted bushes from the Path to where his bulkhead connected with appellant's bulkhead. Thus, by 1974 his lot was totally enclosed by the hedge he constructed running along the Path and to the connection of his bulkhead with appellant's, the hedge across his bulkhead, and the Giacofcis' hedge along his western boundary.

In June 1974, a representative of appellant contacted Sahandy to inform him that appellant had "made a mistake." Appellant contended that the western end of its bulkhead "ended

about 10 feet east" of Sahandy's property line, and thus Sahandy's bulkhead "encroached on Community land by about 10 feet." His hedge enclosed a small, triangular portion of the Community Beach. We pause to note that, in its Memorandum Opinion and Order, the trial court referred to this piece of land as the "Eastern Triangle." The three sides of the triangle were: (a) Sahandy's hedge from the Path to the point where his bulkhead joined with appellant's, (b) the ten feet of his bulkhead that allegedly extended into the community pier area, and (c) what appellant contended was Sahandy's actual property line.

According to the Stipulation, Sahandy recalled in his trial testimony that he responded to appellant

by indicating that he did not agree that his bulkhead or bushes encroached, but if, in fact, any part of the eastern end of his bulkhead or the bushes he planted were on [appellant's] land, it was due to [appellant's] mistake, not his, and [appellant] would have to pay him the cost of the bulkhead which he installed between their bulkhead and what they contended to be his property line and move the bushes.

The minutes of the Board's meeting on June 25, 1974, indicate that "the Board agree[d] [it would] find out what proportion of the bulkheading is ours and ... will pay the bill." However, Hillsmere "never actually took any such action" to determine "what portion was on their Property." Nor did Hillsmere pay Sahandy or move the bushes. In 1980, after Sahandy refused to sign an agreement acknowledging that the bushes were on community land and that he would not claim adverse possession to the enclosed area, the Board passed a motion revoking any "authority given Dr. Sahandy to plant bushes on HSIA property at the corner of his lot...."

The Stipulation also provides:

Shortly after installing the bulkhead in the mid–1970's, Dr. Sahandy believed that he needed more protection for the bulkhead and installed some rip-rap along the front of the bulkhead. Some time later, it became apparent that the

rip-rap was not sufficient. Around 1990, Dr. Sahandy had large rocks brought in and stacked on his property and then had a Bobcat drop the rocks in front of the bulkhead.

Sahandy continued to maintain the bulkhead behind his lot as well as the surrounding bushes. He removed the hedges from the top of the bulkhead in 2003, after his children had grown and no longer needed protection from the water. Sahandy testified that until 2003, when appellant claimed that his bushes and bulkhead encroached on the Community Beach, no person disputed his ownership of any portion of the property enclosed by his hedges, other than the Eastern Triangle. Moreover, he testified that he never saw anyone utilize any portion of the area enclosed by his hedges, except as invited guests.

Over the years, Sahandy appealed his real property tax assessment with respect to Lot 17. Sahandy testified that he raised the same issues in each of his appeals, which were filed in 1982–83, 1985–86, 1988–89, 1994–95, and 2002–2003. The parties agree that a letter from Sahandy to the assessor in April 1982, is representative of his various appeals. Among the reasons for contesting his tax assessment, Sahandy asserted:

> *There is a strip of land belonging to the community, between lot and water (shaded on map) and I cannot build a pier and actually these lots are not water front as we do not have Properian [sic] rights.*

> * * *

Lots to the right side of the Community Beach [i.e., the other side of the Path] have Properian [sic] rights, are protected from waves, don't need bulkhead and have sandy beaches. To the left of the Community beach [i.e. Lots 1–17] everything is just opposite, *my bulkhead needs repair* after each severe storm and jettys with moss covered stones prevents any use of the beach. [A]nd waterview is limited—on the other side is unlimited waterview. (Emphasis added).

Along with his letter to the tax assessor, Sahandy enclosed a map of the portion of the Subdivision containing his lot, on which he had shaded by hand an area representing the Community Beach, including the portion between his lot and the water. The map, which appears to be a copy of a map that was prepared by the Developer when it created the Subdivision, does not indicate the location of the bulkhead that Sahandy had installed.

In 1996 Sahandy purchased another lot in the Subdivision at a tax sale; identified as Lot 7 of Section 3, Block "T," known as 621 Tayman Drive. That property is not adjacent to any of the properties that are the subject of this case, and does not abut the Community Beach. The deed by which Sahandy acquired 621 Tayman Drive provides that Sahandy took the property "in fee simple ... TOGETHER with the buildings and improvements thereon erected or being, and all the rights, privileges, appurtenances and advantages hereon belonging or appertaining, free and clear of all liens and encumbrances thereon occurring prior to [October 3, 1996]."

### E. Procedural History

In *Hillsmere I,* we provided the following procedural history of the case, slip op. at 11–23:

[Appellant] filed identical motions to dismiss each suit, on August 18, 2003, September 9, 2003, and October 7, 2003, respectively. Appellant presented a host of contentions including, *inter alia,* the defenses of sovereign immunity; failure to join all lot owners of the Subdivision as necessary parties; and that the disputed area "is part of a single unified lot conveyed" to appellant "in a passive trust to be used exclusively as a 'community beach' for the benefit of the [Association], which owns other lots in the subdivision, and all other lot owners in the subdivision[,]" [as well as arguments that various provisions of the Anne Arundel County Code precluded appellees from acquiring title to portions of the Community Beach by adverse possession].

\* \* \*

On January 5, 2004, the court heard argument in regard to appellant's motion to dismiss. On January 6, 2004, the court issued a "Memorandum Opinion," in which it again denied appellant's motion.

\* \* \*

Thereafter, in May 2004 the parties filed cross-motions for summary judgment.

\* \* \*

By Order dated May 20, 2004, the court granted summary judgment in favor of appellees, "relying on the case law and reasoning articulated in [appellees'] Motion for Summary Judgment."

The appeal in *Hillsmere I* followed. As noted, the *Hillsmere I* Court concluded that the other lot owners in the Subdivision were necessary parties to the suit, and remanded for further proceedings. We did not decide any other issues raised in the appeal.

On remand, after several procedural turns that we need not catalogue, the case was tried to the court on June 5 and 6, 2007. In its twenty-one-page "Memorandum Opinion and Order," issued on July 19, 2007, the circuit court considered the various arguments advanced by the parties and concluded: "The Court finds that [appellees] possessed the disputed properties continuously, openly and notoriously, actually and in a hostile manner for a period of 20 years or more. Therefore, they have fully demonstrated that they have acquired title through adverse possession."

In a separate "Order," dated July 19, 2007, the court "ORDERED AND DECLARED that judgment is entered in favor of the Plaintiffs, D. Gregory and Susan G. Singleton, Parvix Sahandy, and Edward R. Hertz and Leah G. Hertz," and, as to each of the disputed properties, declared that the respective lot owner owned the property "free and clear of any interest of [appellant] or any of the lot owners in [the Subdivision]...." Additionally, the court "ORDERED that this Order may be recorded among the Land Records of Anne Arundel County any time after all rights of appeal have been

exhausted." The court attached to the Order a plat and a metes and bounds description of each disputed parcel.

We shall include additional facts in our discussion, as well as the trial court's rulings as to each issue.

## II. DISCUSSION

### A. Standard of Review

As we review here an action that was tried without a jury, Md. Rule 8–131(c) applies:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

"A factual finding is clearly erroneous if there is no competent and material evidence in the record to support it." *Hoang v. Hewitt Ave. Assocs., LLC,* 177 Md.App. 562, 576, 936 A.2d 915 (2007); *see YIVO Inst. for Jewish Research v. Zaleski,* 386 Md. 654, 663, 874 A.2d 411 (2005). The "clearly erroneous" standard does not apply, however, to questions of law. " 'When the trial court's [decision] "involves an interpretation and application of Maryland statutory and case law, [the appellate court] must determine whether the lower court's conclusions are legally correct...." ' " *White v. Pines Cmty. Improvement Ass'n,* 403 Md. 13, 31, 939 A.2d 165 (2008) (citations omitted). We make this determination *de novo,* without deference to the legal conclusions of the lower court. *Hoang,* 177 Md.App. at 576, 936 A.2d 915 (citing *L.W. Wolfe Enters., Inc. v. Maryland Nat'l Golf, L.P.,* 165 Md.App. 339, 344, 885 A.2d 826 (2005)). *See also Yourik v. Mallonee,* 174 Md.App. 415, 423 n. 2, 921 A.2d 869 (2007) (standard of appellate review of judgment concerning adverse possession); *Porter v. Schaffer,* 126 Md.App. 237, 259, 728 A.2d 755, *cert. denied,* 355 Md. 613, 735 A.2d 1107 (1999) (same).

## B. Adverse Possession—Generally

We begin with an overview of the doctrine of adverse possession, which is central to the issues on appeal. Writing for this Court, Judge Adkins discussed the doctrine of adverse possession in *Yourik v. Mallonee,* 174 Md.App. at 422, 921 A.2d 869, stating:

> "Adverse possession is a method whereby a person who was not the owner of property obtains a valid title to that property by the passage of time." Md. Civ. Pattern Jury Instr. 2:1 (MPJI–Civ.). "A number of policy justifications for the doctrine of adverse possession have been advanced." Herbert T. Tiffany & Basil Jones, *Tiffany Real Property,* Neighbor § 6:2 (1975, through Sept. 2006).... Most commonly, "courts justify the existence and application of adverse possession" for one or more of the following reasons:
>
>> First, there is a societal interest in "quieting" title to property by cutting off old claims. Second, there is a desire to punish true owners of land who neglect to assert their proprietary rights. Third, there is a need to protect the reliance interests of either the adverse possessor or others dealing with the adverse possessor that are justifiably based on the *status quo.* Last, an efficiency rationale, asserting a goal of promoting land development, seeks to reward those who will use land and cause it to be productive.

*Id.*

 The elements of adverse possession are well settled: " 'To establish title by adverse possession, the claimant must show possession of the claimed property for the statutory period of 20 years....' " *White,* 403 Md. at 36, 939 A.2d 165 (citation omitted). Moreover, " '[s]uch possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted.' " *Id.*; *see also, e.g., E. Wash. Ry. v. Brooke,* 244 Md. 287, 294, 223 A.2d 599 (1966); *Bishop v. Stackus,* 206 Md. 493, 498, 112 A.2d 472 (1955); *Gore v. Hall,* 206 Md. 485, 490, 112 A.2d 675 (1955);

*Senez v. Collins,* 182 Md.App. 300, 310, 957 A.2d 1057, 1070 (2008); *Yourik,* 174 Md.App. at 422–23, 921 A.2d 869.[10] The "statutory period" is established by Md.Code (2006 Repl. Vol., 2007 Supp.), § 5–103 of the Courts and Judicial Proceedings Article ("C.J."), which requires that "[w]ithin 20 years from the date the cause of action accrues," a landowner must either "[f]ile an action for recovery of possession of a corporeal freehold or leasehold estate in land," or "[e]nter on the land."

 "The burden of proving title by adverse possession is on the claimant." *Costello v. Staubitz,* 300 Md. 60, 67, 475 A.2d 1185 (1984); *see Hungerford v. Hungerford,* 234 Md. 338, 340, 199 A.2d 209 (1964). The test is objective: "In evaluating a claim, the pertinent inquiry is whether the claimant has proved the elements 'based on the claimant's "objective manifestation" of adverse use, rather than on the claimant's subjective intent.'" *Porter,* 126 Md.App. at 276, 728 A.2d 755 (quoting *Barchowsky v. Silver Farms, Inc.,* 105 Md.App. 228, 241, 659 A.2d 347, *cert. denied,* 340 Md. 301, 666 A.2d 1236 (1995)).

In this case, the parties' disputes do not implicate every element of adverse possession. We shall elucidate the relevant areas of the doctrine of adverse possession in the context of appellant's specific claims.

---

**10.** The classic formulation of the elements of adverse possession contains several words that are terms of art. In *Yourik,* 174 Md.App. at 427, 921 A.2d 869, we recognized: "The plethora of phrases ... may confuse rather than clarify." Ordinarily, "[a]cts that make possession 'actual' are ... sufficient to make it visible and notorious." *Orfanos Contractors, Inc. v. Schaefer,* 85 Md.App. 123, 130, 582 A.2d 547 (1990) (citation omitted); *see Blickenstaff v. Bromley,* 243 Md. 164, 170, 220 A.2d 558 (1966) (determining that the court "may conveniently consider ... together" factors of actual, open and notorious, and exclusive possession). Moreover, "the terms 'claim of title,' 'color of title,' 'claim of ownership,' and 'claim of right,' ... are alternative methods of proving that the claimant's possession was sufficiently 'hostile' to be 'adverse.'" *Yourik,* 174 Md.App. at 424, 921 A.2d 869. In other words, "a 'claim of title or ownership' is not a separate and distinct element of an adverse possession claim, in addition to hostility." *Id.* at 426–27, 921 A.2d 869.

## C. Riparian Rights

Hillsmere devoted some portions of its brief, and much of its presentation at oral argument, to the proposition that appellees' "construct[ion of bulkheads] is not and can not be an act of adverse possession." It argues:

Regardless of the Appellees' intent, . . . if the Appellees built the bulkheads without the permission of H.S.I.A., as the riparian owner of the land, but only in the capacity of enforcer of the covenants, the title to the bulkheads vested in the Appellant, as riparian owner, immediately upon completion of the bulkhead. *See White v. Pines*, 403 Md. 13, 939 A.2d 165 (2008); *White v. Pines*, 173 Md.App. 13, 917 A.2d 1129 (2007); *City of Baltimore v. St. Agnes Hospital of City of Balt.*, 48 Md. 419, 422 (1878). . . .

This action to sever title to a portion of the waterfront property from the balance of the community beach and to sever the lot owners' rights to use the entire community beach destroys the riparian rights previously existing in H.S.I.A. and the lot owners and this can not be done.

In this regard, appellant cites to Md.Code (2007 Repl. Vol., 2007 Supp.), § 16–103(a) of the Environment Article, which provides: "Except as specifically provided in this title, a riparian owner may not be deprived of any right, privilege, or enjoyment of riparian ownership that the riparian owner had prior to July 1, 1970."

Appellees respond:

This case has never centered on riparian rights. There is not one single claim made to riparian rights by the Appellees. The Appellees sought adverse possession to certain land which was defined by their possession, which possession ran between certain defined side boundaries, down to the far side of bulkheads, which were erected by them or their predecessors and maintained by them. Whether those bulkheads abut the mean high water line and, thus, carry with them riparian rights, was not something that was ever

adjudicated or discussed in the case since it was irrelevant to the issue.[11]

We need not determine whether appellant failed to preserve the point, as appellees claim,[12] because appellant's argument fails on the merits. We explain.

■ Central to appellant's contention is its claim that appellees' bulkheads "vested in the Appellant, immediately upon completion . . .", because appellant owned the Community Beach on which the bulkheads were constructed. In this regard, appellant cites the appellate decisions in *White v. Pines Cmty. Improvement Ass'n,* 173 Md.App. 13, 917 A.2d 1129 (2007), *aff'd in part, vacated in part on other grounds,* 403 Md. 13, 939 A.2d 165 (2008), as well as *Mayor & City Council of Baltimore v. St. Agnes Hospital,* 48 Md. 419 (1878). Even if Hillsmere is correct that title to the bulkheads vested in appellant immediately upon their construction, we do not construe these cases to defeat appellees' adverse possession claims.

*St. Agnes Hospital* concerned a lot in Baltimore City owned by the hospital, which fronted on the Patapsco River. *Id.* at 421. The City constructed a 300–foot "dock across the lot of [the hospital], thus depriving [it] of a water front. . . ." *Id.* The hospital brought an ejectment action against the City, *id.* at 419, asserting ownership of the dock and the "land made [by the dock's construction] between the side of the dock and

---

**11.** Appellees acknowledge that "all of the Hertz and Sahandy bulkheads and virtually all of the Singleton bulkhead, abut the mean high water line."

**12.** Under Maryland Rule 8–131(a), an appellate court "[o]rdinarily . . . will not decide any [non-jurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court. . . ." At best, appellant raised this point below in passing. In his closing argument to the circuit court, appellant's counsel contended that our decision in *White v. Pines Cmty. Improvement Ass'n,* 173 Md.App. 13, 917 A.2d 1129 (2007), *aff'd in part, vacated in part on other grounds,* 403 Md. 13, 939 A.2d 165 (2008), stands for the proposition that "there is absolutely no citation found where the installation of the bulkhead or backfilling behind it will in any way erase the community property."

the Port Warden's line." *Id.* at 421–22. In response, the City claimed that it owned the dock, contending that the dock was constructed "at the foot of Webster Street ... one of the public streets of the city...." *Id.* at 420. The Court determined, however, that the City did not own Webster Street, because the street had "never been opened as a public street, nor has there been any condemnation or compensation paid to [the hospital, which was] the owner[ ] of the bed of said street." *Id.* at 422. The Court reasoned that, "[u]ntil the street has been opened and compensation paid to the owner[ ]," the City had "no more right to the bed of the street than any other stranger would have, and the intrusion by the city upon such property is as much a trespass as if committed by an individual." *Id.* Because the City had "entered upon the property of the [hospital], and ... constructed the dock ... without the consent of the [hospital]," the Court determined that "such improvements must be declared to belong to the riparian owner, in front of whose lot they are made." *Id.*

*St. Agnes Hospital* is distinguishable from this case. As noted, appellant insists that it obtained title to the bulkheads as soon as they were built. But, appellant overlooks that the trial court determined that, for the statutory period, appellees subsequently possessed the land from their rear lot lines up to and including the bulkheads. *St. Agnes Hospital* turned on the fact that the hospital, rather than the City, owned the bed of Webster Street, the waterfront property to which the City attached its dock. There was no claim in *St. Agnes Hospital* that the City had acquired title to Webster Street by adverse possession.

A similar principle distinguishes the appellate decisions in *White.* In that case, as here, several landowners in a planned community owned lots that were separated from a creek by a strip of community property. *White,* 173 Md.App. at 29, 917 A.2d 1129. A community association held title to the community property, over which all landowners in the community had easement rights. *Id.* at 29–31, 917 A.2d 1129. The properties at issue were the portions of the community property between each of the party landowners' lots and the creek, as well as

piers extending into the creek that each of the party landowners (or their predecessors in title) had built well over twenty years before suit was filed. *Id.* at 27, 917 A.2d 1129. The lot owners asserted, *inter alia,* claims of adverse possession. The trial court found that, as to each putative adverse possessor, the statutory period was interrupted, primarily by regular "community walks" that the community association conducted along the community property. *See White,* 173 Md.App. at 49–59, 917 A.2d 1129.

At the outset, this Court rejected the proposition that the building of the piers *alone* could vest ownership of the piers in the individual landowners. Writing for this Court, Judge Davis quoted *St. Agnes Hospital,* 48 Md. at 422, for the proposition that " 'such improvements must be declared to belong to the riparian owner, in front of whose lot they are made.' " *Id.* at 44, 917 A.2d 1129. The Court also remarked that the appellant cited "no law to support the contention that building a bulkhead and backfilling the land amounts to erasing the Community Land. . . ." *Id.* at 53, 917 A.2d 1129. Quoting our analysis at length, *White,* 403 Md. at 37–44, 939 A.2d 165, the Court of Appeals agreed that "while there is evidence to the contrary, there is sufficient evidence (albeit barely in some cases) in the record to support the trial court's findings. . . ." *Id.* at 44, 939 A.2d 165.

Here, the trial court found that appellees adversely possessed the disputed land between their rear lot lines and the bulkheads. Indeed, in their Stipulation the parties agreed that appellees or their predecessors "blocked the properties at issue for in excess of 30 years. . . ." Because the court below found that appellees' adverse possession of the disputed property was uninterrupted for the statutory period, this case is distinguishable from both *St. Agnes Hospital* (in which no claim of adverse possession was made) and *White* (in which the alleged adverse possession was not continuous for the statutory period). It follows that appellant's reliance on those cases is misplaced.

Appellant seems to suggest that riparian land simply cannot be adversely possessed at all. To be sure, the Court of Appeals in *White* expressed doubt as to "whether riparian rights can ... be lost under a theory of adverse possession...." 403 Md. at 18 n. 2, 939 A.2d 165. But, the Court also noted that it has "never decided the issue," and it "expressly le[ft that issue] for another time." *Id.* Moreover, the Court of Appeals's comments concerned a scenario in which a claimant alleged that *"only* riparian rights [were] claimed by adverse possession ...*,* i.e., the right of access to water, *and no fast land is claimed...."* *Id.* (Emphasis added.) This case does not present that fact pattern. Appellees claim adverse possession of the land between their rear lot lines and the bulkheads. Thus, this case concerns adverse possession of land to which riparian rights may attach, not adverse possession of riparian rights alone.

■ Appellant also takes issue with the extent of the disputed property that the trial court awarded to appellees. In its Memorandum Opinion and Order, the court articulated the legal principles that governed its determination:

Where the claimant makes a claim to the land under color of title, the claim of adverse possession extends to the property within the outlines of the claimant's title. *Goen v. Sansbury,* 219 Md. 289, 149 A.2d 17 (1959). Where the claimant does not claim the land under color of title, adverse possession only extends to the land actually occupied by the claimant. *Peters v. Staubitz,* 64 Md.App. 639, 645, 498 A.2d 661 (1985). Title will also vest in all the land within visible boundaries that have existed for the statutory period, whether actually occupied or not, where the claimant has engaged in unequivocal acts of ownership over the land. *Tamburo v. Miller,* 203 Md. 329, 336, 100 A.2d 818 (1953).

Hillsmere appears to concede the accuracy of the court's statement of the law. Nevertheless, it charges that the court did not correctly apply these principles. According to appel-

lant, the trial court's award included land outside of the visible boundaries, which appellees did not occupy.

With respect to the Singletons, appellant argues:

> The Singletons testified that their hedges went from the street to the bulkhead and that they cared for the grounds and cut the grass to the bulkhead. [T]he bulkhead itself belonged to the Appellant under any theory ... and ... there is no evidence that the Singletons possessed or committed any unequivocal acts of ownership on or to the bulkhead after it was built and title vested in [appellant]; yet the Trial Court's Order gave the Singletons title to the land up to the bulkhead, title to the bulkhead itself and from the top of the bulkhead to the mean high tide. There is simply no evidence in the record that shows the Singletons possessed any property from the grass next to the bulkhead to the mean high tide.

Appellant advances a similar argument with respect to the Hertzes and Sahandy, with the additional wrinkle that both the Hertzes and Sahandy testified that each of their properties "had an impenetrable hedge across the bulkhead." According to appellant, the court erred in awarding the Hertzes and Sahandy "the land between the hedges and the bulkheads, the bulkheads themselves and the area from the bulkhead to the mean high tide." "Unfortunately for the Appellees," asserts Hillsmere, "the word 'impenetrable' means not only do hedges prevent people from the outside from getting in, it also means people on the inside can not control the land beyond."

Appellees respond that they either built or maintained their bulkheads throughout the statutory period. Moreover, with respect to Sahandy and the Hertzes, appellees reject appellant's claim that there is "land between the hedges and the bulkheads," contending that "[a]n examination of the photographs [in evidence] reveals that the bushes were planted and maintained so as to completely cover the bulkheads[s]." According to appellees, there is no land between the hedges and the bulkheads, and "such planting and maintenance [of the hedges] was an act of possession [of the bulkhead] in and of

itself." In sum, appellees assert that the trial court's rulings as to the extent of appellees' possession "are factual determinations" and "there were more than adequate facts from which [the trial court] could determine that the possession extended to the bulkhead[s]." Asserting that "proper factual determinations" are "reserved" to the trial court, appellees urge us to sustain those findings.

Apparently, Hillsmere believes that it would be possible for appellees to possess the land all the way up to the bulkheads, which are essentially wooden retaining walls protecting the land behind them from erosion, but that the possessory acts over the land would not be sufficient to possess the bulkheads themselves. Even assuming, without deciding, that appellant is correct in this unsupported proposition, we agree with appellees that there was sufficient evidence in the record to allow the fact finder to conclude that appellees possessed the disputed portions of the Community Beach up to *and including* the bulkheads.

Of note, the parties agree that the Singletons constructed their bulkhead. In response to a question at trial from appellees' counsel as to "who maintained the property that lay between the fences and the bulkhead[ ]," Gregory Singleton responded: "We maintained that area at all times." Moreover, Gerri Singleton testified that she gave permission to the child of another family in the Subdivision, whom she employed to mow the lawn, to fish off of the bulkhead. As to the Hertzes, their bulkhead predated their ownership of Lot 15, but they maintained it by completely rebuilding it after it was damaged by Hurricane David in 1979. The record is also replete with evidence of Sahandy's construction and continued maintenance of his bulkhead, such as his assertion in his tax appeal that "my bulkhead needs repair after every severe storm." In addition, the record indicates that, on several occasions, Sahandy was responsible for installing riprap in front of his bulkhead. Further, the photographic evidence supports appellees' assertion that a rational fact finder could conclude that the hedges along the bulkheads constructed by the Hertzes and Sahandy were immediately adjacent to or on

top of the bulkheads, and that the "land between the hedges and the bulkheads," which appellant hypothesizes, does not exist.

As to any land "from the bulkhead to the mean high tide," the circuit court made no factual findings that the Hertzes or Singletons possessed such land. The metes and bounds descriptions that accompanied the circuit court's Order, describing the land that the Singletons and the Hertzes possessed, refer to the area of adverse possession as extending "to an existing wood bulkhead northerly of the shoreline of the South River," in the case of the Singletons, and "to an existing wooden bulkhead, being the high water mark of the South River," in the case of the Hertzes. As to Sahandy, the metes and bounds description of the area of possession extends "to a point on the high water mark of the South River, thence binding upon the said the [sic] waters of the South River as witnessed by riprap stone...."

Accordingly, there was competent evidence in the record to show appellees' enclosure and/or actual use of all of the land awarded to them by the circuit court. To the extent that any land exists between the land appellees actually possessed and the water (as there may be in the case of the Singletons), the circuit court did not award that land to appellees. Thus, we reject appellant's argument.

## C. Hostility

Appellant's next argument primarily pertains only to Sahandy and the Singletons. Appellant argues that these appellees "could not claim adverse possession because they had recognized the rights of Appellant to control their use of the land at issue," in that both lots "had a bulkhead installed after seeking and obtaining permission from H.S.I.A." In particular, these appellees sought appellant's permission during the permitting process; the Singletons sought appellant's permission to build their fence, and Sahandy sought permission to construct his bulkhead. Appellant points out that the Singletons and Sahandy "testified that they believed that they were required to obtain a building permit from [appellant]."

According to appellant, because the Singletons and Sahandy sought appellant's permission for their building activities, "they have acknowledged their subordinate position to the rights and powers of the Appellant and any possession by them no matter how long standing can ever be adverse."

Appellant posits:

The Appellees testified that they believed that they were required to obtain a building permit from H.S.I.A. The Trial Court found that the permission given to both parties was to build a bulkhead on their land. It is clear that both bulkheads are well within the right of way, water front property of H.S.I.A. and encroached upon H.S.I.A.'s riparian rights.

Whether the Appellees applied for permission to build a bulkhead because they believed that was required by the 1952 and 1955 covenants, or by the fact that the 1965 Deed and Agreement giving the Community Beach to H.S.I.A. imposed upon H.S.I.A. an affirmative duty to ensure that the Community Beach was only used as a community beach (Exhibit X–APP 164–171), or by the fact that H.S.I.A. owned and therefore had the right to control the right of way is irrelevant. It is equally irrelevant whether or not a building permit was needed for the bulkheads or required by H.S.I.A.

The Court of Appeals has repeatedly held that objective events and not the motives or intentions of the claimants determine the existence of adverse possession. The fact that the Appellees' actions were predicated on inadvertence, ignorance, or mistake, is entirely immaterial. *Tamburo v. Miller*, 203 Md. 329, 100 A.2d 818 (1953); *Mauck v. Bailey*, 247 Md. 434, 231 A.2d 685 (1967).

The issue is not whether the Appellees actually declared that H.S.I.A. was the owner of record or holder of riparian rights. The issue is whether or not the Appellees under took an act which reflects that they subjected the property in issue to the discretion and control of the Appellant.

The trial court rejected appellant's argument. While recognizing that the facts before it "may create doubt as to the parties' understanding regarding the ownership of the property where the bulkhead was to be built," the court determined that "[t]he doubts can be laid to rest by ... the letter of permission from [appellant] to the Singletons." The court explained:

The letter stated that [appellant] gave the Singletons permission to build the bulkhead 'on their property located at 117 E. Bay View Drive.' Based on this evidence, as well as testimony by the Singletons that they believed that they needed to seek permission from [appellant] to build a bulkhead on their property, [appellant's] contention that the Singletons acknowledged [appellant's] ownership is unconvincing.

Although the trial court, in its opinion, did not explicitly address this argument as to Sahandy, there is no dispute as to the facts, and the same logic applies. According to the parties, Sahandy initially requested that appellant construct a bulkhead across the rear of his lot, but appellant denied his request, informing Sahandy that it was unwilling to perform work on "private property." Moreover, when the Board approved Sahandy's permit application, it stated that it "had no objection to [the] bulkhead [Sahandy] plans to build *on his property*." (Emphasis added).

Appellant maintains that the trial court erred in this regard, asserting that appellees' "subjective motive[ ] in seeking permission is not a consideration that the Trial Court had the right to consider." HSIA asserts:

Whether the Appellees applied for permission ... because they believed that was required by the 1952 and 1955 covenants, or by the fact that the 1965 Deed and Agreement giving the Community Beach to [appellant] imposed upon [appellant] an affirmative duty to ensure that the Community Beach was only used as a community beach, or by the fact that [appellant] owned and therefore had the right to control the right of way is irrelevant. It is equally irrele-

vant whether or not a building permit was needed ... or required by [appellant].

* * *

The issue is whether or not the Appellees undertook an act which reflects that they subjected the property in issue to the discretion and control of the Appellant.

Appellees respond: "Although the Appellant is correct that the actions of the Appellees are to be measured by objective facts, [appellant's] argument does not follow from that premise." According to appellees, "the objective manifestation was that the parties applied for permits because the Covenants required them" to do so. They characterize as "absurd on its face" appellant's argument that "anyone who applies for a permit, is admitting that [appellant] owns the requesting party's land...." Further, appellees argue that "the objective manifestation was that [appellant] recognized and, in fact, stated that the property belonged to the Appellees."

As we see it, appellant's contention touches upon the requirement that, in order to be adverse, possession must be hostile, under color of title or claim of right. In support of its position, appellant cites our recent decision in *Yourik v. Mallonee, supra,* 174 Md.App. 415, 921 A.2d 869. In our view, appellant's reliance on *Yourik* is misplaced.

Writing for this Court in *Yourik,* Judge Adkins exhaustively explained the meaning of the hostility requirement; we shall quote liberally from her discussion. She began by clarifying that "the terms 'claim of title,' 'color of title,' 'claim of ownership,' and 'claim of right', all ... are alternative methods of proving that the claimant's possession was sufficiently 'hostile' to be 'adverse.'" *Id.* at 424, 921 A.2d 869. The variety of alternative proofs may be collapsed to the two phrases used by Maryland Code (2003 Repl. Vol.), § 14–108(a) of the Real Property Article ("R.P."): "under color of title" and "under claim of right." There is no " 'hostile' circumstance that could not be adequately characterized by one of these two terms." *Id.* at 427, 921 A.2d 869.

As to the first term, " '[c]olor of title is that which in appearance is title, but which in reality is not good and sufficient title.' " *Id.* at 424, 921 A.2d 869 (citation omitted). The phrase, "under color of title," describes a situation in which a claim to land is based on an instrument that appears to give title—an instrument that, while actually defective in some manner, is " '*prima facie* good in appearance [so] as to be consistent with the idea of good faith on the party entering under it.' " *Id.* (citation omitted).

The case at bar does not concern a claim under color of title, and neither did *Yourik.* Of import here, much of the discussion in *Yourik* was devoted to answering "whether one who acknowledges that another holds a recorded deed to the disputed property may establish the requisite hostility 'under claim of right.' " *Id.* at 428, 921 A.2d 869. Such an occupancy falls into the category of a "claim of right," which means "that the occupancy rests on the claimant's demonstrated 'intention to appropriate and hold the land as owner, and to the exclusion, rightfully or wrongfully, of every one else.' " *Id.* (citation omitted). In this regard, the *Yourik* Court explained, *id.* at 428–30, 921 A.2d 869 (emphasis in original):

In establishing the hostility of a particular use, a showing that the use has been made " 'openly, continuously, and without explanation for twenty years,' " justifies a presumption that such use was adverse.

\* \* \*

[T]he term "hostile" signifies a possession that is adverse in the sense of it being "without license or permission," and "unaccompanied by an recognition of . . . the real owner's right to the land." *See [Hungerford v. Hungerford,* 234 Md. 338, 340, 199 A.2d 209 (1964)] (citing 4 Herbert T. Tiffany & Basil Jones, TIFFANY ON REAL PROPERTY § 1142 (1975, through Sept. 2006)); *Mavromoustakos v. Padussis,* 112 Md.App. 59, 65, 684 A.2d 51 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997). The type of "recognition of right" that destroys hostility is not mere acknowledgment or awareness that another claim of title to the property exists, but rather **acceptance** that another has a **valid right** to the

property, and the occupant possesses subordinately to that right.

The *Yourik* Court also quoted with approval from the *Restatement (First) of Property,* stating, 174 Md.App. at 430–31, 921 A.2d 869 (emphasis added and omitted):

"To be adverse it is not essential that a use ... be made either in the belief or under a claim that it is legally justified. **It is, however, necessary that the one making it shall not recognize in those as against whom it is claimed to be adverse an authority either to prevent or to permit its continuance.** It is the non-recognition of such authority at the time a use is made which determines whether it is adverse.... **A use which is not made in recognition of and in submission to a present authority to prevent it or to permit its continuance is adverse** though made in recognition of the wrongfulness of the use and, also, of the legal authority of another to prevent it."

Here, the question presented to the circuit court was whether, by seeking permission to build the bulkhead and the fence on the disputed properties, Sahandy and the Singletons recognized the superior ownership right of appellant to the disputed properties, so as to defeat hostility. To be sure, as the parties recognize, "adverse possession is to be determined by the objective manifestations of the adverse use, not by the subjective intent of the possessor." *Miklasz v. G.W. Stone, Inc.,* 60 Md.App. 438, 443, 483 A.2d 382 (1984). But, the circumstances in which appellees sought permission from appellant, and the statements that the parties made in the course of the permitting process, are no less "objective" than the fact that appellees sought permission. Indeed, the assertion that appellees sought permission is inseparable from the issue of what they sought permission to do.

Our recent decision in *Senez, supra,* illustrates these principles. There, Mr. and Ms. Collins and Ms. Senez owned adjoining properties separated by a wall that did not track the actual property line. *Senez,* 182 Md.App. at 308, 957 A.2d at 1061. The Collins sued Senez for trespass on a portion of

property that belonged to them by title, but was situated on Senez's side of the wall; Senez counterclaimed for title to the disputed area based on adverse possession. *Id.*, at 307–09, 957 A.2d at 1061. Shortly before the expiration of the statutory twenty-year period, Senez had hired a contractor to erect a "privacy fence" along the wall that separated the properties. *Id.*, at 314–15, 957 A.2d at 1065. The parties agreed that, before the fence was installed, Senez and Ms. Collins had discussed where the fence was to be located. *Id.*, at 314–18, 957 A.2d at 1065–66. However, the parties disputed the details of the conversation. *Id.*

In Ms. Collins' version, Senez "asked her, before she built the privacy fence, 'can my fence follow the wall instead of the property line?'" *Id.*, at 342–43, 957 A.2d at 1081. In contrast, Senez "recalled that she 'mentioned' to [Ms. Collins] that her contractor had suggested placement of the fence 'up on top of the [W]all,' rather than alongside it, so as to 'eliminate that small space between the fence and the [W]all.'" *Id.*, at 342–43 n. 17, 957 A.2d at 1081 n. 17. The circuit court did not resolve the conflicting evidence as to what was said, and we remanded for further fact finding, noting that "[i]nterpretation of the legal effect of such a conversation is contingent on the precise facts of the conversation." *Id.*, at 346, 957 A.2d at 1083. We explained, *id.*:

> Ms. Collins's account of her conversation with [Senez], if believed, may be seen as an acknowledgment by Senez of the Collins' superior right to the disputed area, which would defeat the hostility required for adverse possession. On the other hand, [Senez's] version of the conversation ... coupled with her conduct in erecting the fence without [the Collins's] permission, would not evince such an acknowledgment.

In this case, as in *Senez*, whether the conduct of the Singletons and Sahandy in seeking appellant's "permission" to erect the fence and bulkhead, respectively, constituted an "acknowledgment ... of [appellant's] superior right to the disputed area," *id.*, is dependent on context. But, unlike in

*Senez,* in this case there is no unresolved conflict in the evidence.

As noted, the parties agree that the Singletons and Sahandy were required by the "Hillsmere Rules" and covenants in their deeds to obtain appellant's permission for any construction *on their own property* if a building permit was required, or for any fences or "obstructions to water rights." The trial court found that appellees complied with those requirements. In its view, appellees' conduct in complying with the Hillsmere Rules did not constitute a recognition that appellant was entitled to oust them from possession of the disputed area, or that their possession was subordinate to the ownership of appellant. Based on undisputed evidence, the trial court determined that both appellees and appellant objectively manifested the belief that the disputed properties belonged to appellees. Contrary to appellant's assertion, the circuit court's decision was not improperly based on appellees' "subjective motives," nor was it clearly erroneous.

On similar grounds, appellant also argues that Sahandy's series of real property tax assessment appeals constituted the renunciation of any claim of adverse possession.[13] Appellant points out that in Sahandy's tax appeals, Sahandy specifically stated: "There is a strip of land belonging to the community, between lots and water...." According to appellant, because the tax assessment review board is a "quasi-judicial administrative agenc[y]," Sahandy's statements to it are subject "to the effects of both collateral estoppel and judicial admissions." Moreover, Hillsmere claims that, at the "quasi-judicial proceeding, the issue of owning waterfront property or having riparian rights was raised and decided, and it was determined that Dr. Sahandy was correct in that he in fact owned no waterfront property and no riparian rights."

---

**13.** The parties have not informed us whether Hillsmere paid taxes on the disputed properties. In Maryland, "[p]ayment of taxes is a salient fact in support of, but alone not sufficient to prove, adverse possession." *White,* 173 Md.App. at 53, 917 A.2d 1129 (citing *Bratton v. Hitchens,* 43 Md.App. 348, 358, 405 A.2d 333 (1979)).

Hillsmere also suggests that because Sahandy "renounced any claim to waterfront property [he] may never obtain same by adverse possession." In this regard, appellant relies on the hearing sheets, worksheets, and docket sheets from Sahandy's 1982 assessment, contending that various cryptic and abbreviated notations on the documents demonstrate that the assessed value of Sahandy's property was reduced based on the determination that Sahandy did not own waterfront property.

Contending that the circuit court erred in rejecting its contention, Hillsmere argues:

Dr. Sahandy did more than acknowledge that [appellant] could stop him from building a pier. He specifically renounced owning any waterfront property or possessing any riparian rights. His statements were clear and absolute. This is more than simply determining that the claimant has recognized the interest and authority of another by their acts, conduct or statements as viewed in the light of the surrounding circumstances.

Appellees disagree, insisting instead that "the Tax [Court] specifically stated that, if Dr. Sahandy could not see the land at high tide, then he did have riparian rights and, thus, the Tax Judge denied his appeal." Indeed, Sahandy testified at trial that "in all those appeals, they did not agree with me that I wasn't waterfront and they did not reduce the value on that basis." Moreover, Sahandy testified: "I vaguely remember when I finally went to tax court and [the] Judge asked me about that piece of land that I said is in front of me [i.e., on the creek side of the bulkhead] and he said, do you see that land? I said no, you cannot see it. It is eroded. So then you are waterfront. I said, no, according to the map, we are not." He added that "they never reduced the value of the Lot because of [the] waterfront problem. They did not agree with me."

The trial court did not resolve what the determination of the Tax Court had been.[14] Instead, it determined that Sahandy

---

14. We note that the parties have included in the record extract what appear to be worksheets prepared by the County tax assessor pursuant

did not, in fact, renounce his ownership of the disputed parcel in his tax appeals. It said:

> [Appellant] makes much of [Sahandy's] acknowledgment and the fact that the area actually shaded on the map [that Sahandy submitted with his appeal letter], indicating that it is [appellant's] property, appears to be an acknowledgment that [appellant] owned the right of way between his land and the bulkhead. In comparison to the Meekins Survey . . . the hashmarks on the map cover the right of way between the bulkhead and Dr. Sahandy's lot, although the bulkhead is not depicted on Dr. Sahandy's map. It must be taken into account that Dr. Sahandy is not a surveyor and did not have the benefit of a survey when he made the drawing. The marks on the map might also have been fatal to Dr. Sahandy's claim if the bulkhead had been depicted in the drawing. Regardless of the marks on the drawing, *Dr. Sahandy's position as to where his property ends is made clear by his statement in the letter that "my bulkhead needs repair after each severe storm." This demonstrates that Dr. Sahandy believed the bulkhead to be on his property and that [appellant's] land lay on the water side of the bulkhead.* (Emphasis added.)

The court's factual finding was supported by competent evidence. Accordingly, we discern no clear error in the court's determination.

■■■ Even if we were to reject the circuit court's factual finding, however, and determine that Sahandy asserted in his tax appeals that he did not own the disputed property, that would not necessarily result in reversal. Again, we are guided by *Yourik*, 174 Md.App. 415, 921 A.2d 869.

In *Yourik*, the putative adverse possessor was a mother who "took over" her son's house after the son moved out of the house and defaulted on the mortgage. *Id.* at 418, 921 A.2d

---

to one of Sahandy's challenges to his tax assessment, but the import of these worksheets is by no means clear. The parties have not included a written decision of the Tax Court or a transcript of proceedings in the Tax Court.

869. For well over twenty years, the mother lived in or rented out the home, made mortgage payments until the debt was paid in full, and paid all taxes, utilities, and expenditures for upkeep. *Id.*, 921 A.2d 869. The mother admitted that record title to the house remained in her son's name. *Id.* at 419, 921 A.2d 869. But, the mother made all mortgage and tax payments as well as repairs "on her own behalf," while also retaining rental income generated from the property. *Id.* at 433, 921 A.2d 869. We noted that "the trial court found that [the mother's] occupancy was not permissive, given that [she] did not 'ask [the son's] permission to do anything, because [she] didn't think [she] had to....' " *Id.* at 433, 921 A.2d 869 (quoting trial court).

Notably, this Court rejected the view that the mother's acknowledgment that her son held record title was fatal to her adverse possession claim. Instead, the determining factor was whether the mother " 'recognize[d] in [the son] an authority either to prevent or to permit [the] continuance' " of her possession. *Id.* at 430, 921 A.2d 869 (quoting *Restatement (First) of Property;* emphasis omitted). The Court explained: "The dispositive question that [the son] begs by declaring that [his mother's] acknowledgment equates to such recognition is whether she believed that [her son] could prevent her from occupying [the house], or that it was by [the son's] authority that she exercised ownership rights there." *Id.* at 432–33, 921 A.2d 869. We concluded: "On this record, there was substantial evidence for the court's finding that [the mother's] occupancy was under claim of right.[1]" *Id.* at 433, 921 A.2d 869.

Similarly, in this case, even if Sahandy asserted that appellant was the record owner of the disputed property behind his lot, that would not necessarily have amounted to a recognition of appellant's right to oust him from possession. Particularly with respect to the Eastern Triangle, the undisputed evidence showed that Sahandy specifically rejected appellant's right to oust him from possession. Moreover, he consistently maintained that the bulkhead he constructed was on his property, and refused to sign an acknowledgment of permissive use, or

pledge not to claim adverse possession, as requested by appellant.

Appellant cites two 19th century cases in support of its position: *Campbell v. Shipley*, 41 Md. 81 (1874), and *Stump v. Henry*, 6 Md. 201 (1854).[15] Neither, however, is inconsistent with the analysis derived from *Yourik*.

*Campbell* involved an adverse claim to real property made against a landlord, the record owner, by a tenant under a 99–year lease. *See* 41 Md. at 93–94. The Court rejected the adverse possession claim on the ground that "what will amount to and be proof of adverse possession in ordinary actions of ejectment between strangers, has no application to the case before us." *Id.* at 98. In the case of a tenant attempting to claim against a landlord, the Court said that "there must be, at least, some proof of an actual ouster to rebut the presumption that the possession was in accordance with the title. . . ." *Id.* The *Yourik* Court specifically distinguished cases in which the claimant's "possession was with the consent and permission of the title holder, making his occupation permissive rather than under claim of right." *Yourik*, 174 Md.App. at 433, 921 A.2d 869.

In *Stump*, 6 Md. at 208–209, the putative adverse possessor had done more than acknowledge that title in the disputed property was held by another; during the statutory period, the claimant had sought to purchase the title from the title owners. The Court determined that this was an acknowledg-

---

**15.** Appellant also cites *Baltimore City v. Rowe*, 107 Md. 704, 67 A. 93 (1907). Although the decision in that case is apparently available in West's Atlantic Reporter, *see* 107 Md. 704, 67 A. 93, the cited page of the Maryland Reports shows that the case is contained in a table of "memoranda of cases unreported." Maryland Rule 1–104 bars the citation of unreported cases as precedential or persuasive authority. *See Corby v. McCarthy*, 154 Md.App. 446, 481, 840 A.2d 188 (2003) (construing predecessor rule); *Nicholson v. Yamaha Motor Co.*, 80 Md.App. 695, 717–18 n. 5, 566 A.2d 135 (1989) (predecessor rule, "which clearly bars the use of unreported opinions of this Court for [precedential or persuasive] purposes, may not be circumvented merely because a commercial publisher decides to publish the opinion"), *cert. denied*, 318 Md. 683, 569 A.2d 1242 (1990).

ment of the title owner's right of possession. *Id.* at 209. The record in this case discloses no such attempt by Sahandy.

As Judge Adkins explained in *Yourik*, there are sound policy justifications for recognizing that adverse possession may be established by one who acknowledges that another holds record title: "Requiring a claimant to assert that she holds legal or record title to the property ... 'even though she knows [that] to be false, involves the placing of a premium upon dishonesty, in contravention of the ordinary judicial policy.'" *Yourik*, 174 Md.App. at 431, 921 A.2d 869 (quoting 4 TIFFANY § 1147). Even assuming, contrary to the circuit court's findings, that Sahandy knew that he did not own the disputed property behind his lot, and that he acknowledged that fact in his tax appeals, his honesty in disclaiming title ownership would not necessarily bar his claim of adverse possession, if unaccompanied by an acknowledgment of appellant's superior right of possession.[16]

Accordingly, we agree with the circuit court that Sahandy's tax appeals in this case did not defeat his adverse possession claim.

### D. Continuity of Adverse Possession

The circuit court determined that all of the appellees had adversely possessed their respective properties in excess of the twenty-year statutory period. In its Memorandum Opinion and Order, the trial court said:

---

**16.** Even if Sahandy's April 1982 letter to the tax assessor had disclaimed ownership of the disputed area in his tax appeal, that would not result in judicial estoppel with respect to this claim of ownership by adverse possession. *See, e.g., Eagan v. Calhoun,* 347 Md. 72, 87–88, 698 A.2d 1097 (1997) (discussing judicial estoppel, also known as estoppel by admission). This is because statements by Sahandy at the time of his tax appeals, to the effect that he was not the title owner of the disputed area behind his lot, would not have been inconsistent with his present position that he is now the owner of that area by adverse possession. At the time Sahandy appealed his tax assessments, he was not the title owner of the disputed property, and the statutory period for adverse possession had not yet elapsed. Sahandy only came to own the disputed area by operation of adverse possession.

[I]t appears that the Singleton's [sic] continuously adversely possessed the section of the right of way adjacent to their house from at least 1979 [when they constructed their bulkhead] and running until their receipt of [appellant's] letter in 2003. The Hertzes were in continuous adverse possession of the right of way since they purchased house in 1979 through their receipt of [appellant's] letter in 2003. Through the mechanism of tacking, the adverse possession of the right of way adjacent to the Hertzes['] lot may run as far back as the 1960's or early 1970's when it was enclosed by Mr. Giacofci. Dr. Sahandy's adverse possession of the right of way adjacent to his property goes back to his enclosure of the property around 1974 and his adverse possession of the eastern triangle goes back to his refusal to acknowledge [appellant's] ownership in 1980. Dr. Sahandy's claim was also cut off by [appellant's] letter in 2003.

As to the duration of the Hertzes' adverse possession, appellant asserts two errors in the circuit court's calculation. First, appellant argues that "the trial court erred in allowing the tacking of successive possessions." It is evident, however, on the face of the trial court's Memorandum Opinion and Order, that the court did not find that successive possessions were tacked, nor did it rely on tacking in its determination that the statutory twenty-year period had been met. Instead, the court said: "Through the mechanism of tacking, the adverse possession of the right of way adjacent to the Hertzes['] lot *may* run as far back as the 1960's or early 1970's when it was enclosed by Mr. Giacofci." (Emphasis added.) But, it was not necessary for the court to determine the question of tacking, because it found that the Hertzes' own adverse possession of the property ran from 1979, when they purchased it from the Thompsons, until 2003, when they received appellant's letter challenging their possession—a span of over twenty-three years. Accordingly, we need not consider whether the possession of previous owners could be tacked, or was tacked, to the Hertzes' possession to fulfill the statutory period.

■ Appellant's second objection to the trial court's calculations addresses the end of the statutory period. Hillsmere contends that, "[a]s a matter of law, the Hertzes['] claim of adverse possession in derogation of the right to use of the right of way ended in 1996," with Sahandy's tax sale purchase of another property in the Subdivision, located at 621 Tayman Drive.[17] In this regard, appellant relies exclusively on the Court of Appeals's decision in *Lippert v. Jung*, 366 Md. 221, 783 A.2d 206 (2001).

In that case, Mr. and Mrs. Lippert, purchased a parcel of property in the mid–1970s. *Id.* at 224, 783 A.2d 206. Under the mistaken belief that the parcel included two adjoining vacant lots, they used the other two lots for nearly twenty years. *Id.* at 224–25, 783 A.2d 206. Unknown to the Lipperts, however, the two adjoining properties were sold at a tax sale in May 1991, and, in February 1992, eighteen months before the statutory twenty-year period ripened, a judgment was entered, foreclosing all rights of redemption. *Id.* However, the new title owner under the tax sale took no action to notify or oust the Lipperts until six years after the entry of judgment. *Id.* In response, the Lipperts filed an action to quiet title. *Id.*

The Court of Appeals determined that the tax sale judgment had terminated the period of adverse possession, thus affirming the circuit court's rejection of the Lipperts' claims. Upon surveying Maryland jurisprudence on the subject of tax sales, the Court quoted *McMahon v. Crean*, 109 Md. 652, 665, 71 A. 995 (1909), for the following proposition:

---

**17.** Appellant's argument would similarly apply to the Singletons' possession, which the trial court determined began in 1979. Without explanation, however, appellant only directs this argument to the Hertzes. The tax sale would have no effect on Sahandy's claim, however, even assuming that Sahandy's purchase of another property in the Subdivision could cut short his own period of adverse possession. This is because the trial court determined that Sahandy's adverse possession began in 1974, when he enclosed his lot, and the disputed property behind it, with bushes. Thus, his twenty years of adverse possession had already elapsed by the time he purchased 621 Tayman Drive in 1996.

" 'If the tax deed is valid, then from the time of its delivery it clothes the purchaser, not merely with the title of the person who had been assessed for the taxes and had neglected to pay them, but with a new and complete title ... from the sovereign authority, which bars and extinguishes all prior titles and encumbrances of private persons, and all equities arising out of them.' "

*Lippert,* 366 Md. at 234, 783 A.2d 206 (citations from *McMahon* omitted).

This principle, the Court explained, was fatal to the Lipperts' position. Writing for the Court, Judge Cathell said, *id.* at 235, 783 A.2d 206:

Adverse possession of land in respect to ownership or rights in the land is a concept of title. In other words, if one adversely possesses land for the requisite time, the character of the land is not changed. Whatever its character, the land remains the same. What the adverse user achieves is title to the land—ownership. Accordingly, the nineteen years of adverse possession in the case at bar related to the prior title to the property. That title was extinguished by the creation of a new title to the identical land through the tax sale and foreclosure proceeding, before the possession adverse to the prior title ripened. The title against which the Lipperts' adverse possession was, at one time, running, no longer exists. It is gone.

The appellee holds a completely new title. This title has only existed since 1992. It cannot be said that adverse possession can run against a title that is not in existence, and that, in the absence of proper proceedings, may never exist. In titles derived from valid and proper tax sales and foreclosure proceedings, in order for the inchoate adverse possession to ripen into actual title by adverse possession, the period of twenty years must run from the creation of the new title.[]

Moreover, the *Lippert* Court reasoned that its ruling was consistent with the purpose of the General Assembly in enacting the tax sale statute. It recognized that " 'the legislature

has declared that the public interest in marketable titles to property purchased at tax sales outweighs considerations of individual hardship....'" *Id.* at 230, 783 A.2d 206 (citation omitted).

Appellant argues here, as it did below, that *Lippert* controls the case at bar, stating:

The Tax Deed to Parviz Sahandy gave him the right to use the community beach, which was an easement appurtenant to owning a lot in Hillsmere under the 1965 Deed and Agreement. Under *Lippert v. Jung*, any claims or encumbrances that would interfere with the exercise of the easement under the 1965 Deed were voided. Thus the right of use of the easement under the 1965 Deed and Agreement was free and clear as of November 26, 1996.

In its Memorandum Opinion and Order, the circuit court considered appellant's "proposition that Dr. Sahandy's tax sale purchase wipes out [appellees'] claims of adverse possession," but did "not find this argument persuasive." The court observed that tax sales are governed by Md.Code (2007 Repl. Vol.), § 14–844(b) of the Tax Property Article, which provides that the purchaser at a tax sale obtains

an absolute and indefeasible title in fee simple in the property, free and clear of all alienations and descents of the property occurring before the date of the judgment and encumbrances on the property, except taxes that accrue after the date of sale and easements of record and any other easement that may be observed by an inspection of the property to which the property is subject.

The circuit court ruled:

While *Lippert* is analogous to the present case in many ways, applying it to the present matter would extend the logic of that case to an absurdity. The *Lippert* court ruled that the rights of a tax sale purchaser cut off [the Lipperts'] claims of adverse possession in order to fulfill the legislature's intent of encouraging buyers at a tax sale by guaranteeing them good title. The *Lippert* court was not faced with a situation in which the purchaser at a tax sale was

among the adverse possessors. Moreover, although the mechanism of cutting off adverse possession described in *Lippert* appears to occur automatically, it is worth noting that as a general rule, the reentry by a titleholder must be intentional in order to cut off adverse possession. To rule that adverse possession may be interrupted not only unintentionally, but against the wishes of the interrupting party, who is also the adverse possessor, would be to turn the law of adverse possession on its head.

Appellant challenges the circuit court's resort to "the wishes of the interrupting party," arguing: "The Appellees and the Trial Court have missed the point. Claims are not nullified by a tax deed because that is what the purchaser at the tax sale wants."[18]

According to appellees, there are two types of claims at issue here: "The first is whether [appellees] have *acquired title* to the underlying property from [*appellant*] by adverse possession. The second claim is whether [appellees] have, by adverse possession, eliminated *the easement rights* of the *other lot owners* in [the Subdivision] to utilize any portion" of the disputed properties. (Emphasis added.) Further, appellees assert:

In this particular case, the property which Dr. Sahandy acquired by tax sale may at one time have enjoyed an

---

**18.** Appellant also posits that, when a tax sale is accomplished, the State holds title to the property, albeit briefly, between the point when judgment is entered foreclosing the right of redemption, and when the purchaser receives a deed to the property from the State. Noting that a claim of adverse possession cannot proceed against the State, *Hall v. Gittings*, 2 H. & J. 112, 114 (1807), appellant contends that the State acquired all of the rights under the 1965 Deed and Agreement, including the right to use the Community Beach and the right to ensure that the Community Beach retains its character as community recreational property. Assuming that the State briefly became the title holder of 621 Tayman Drive, it is nevertheless noteworthy that the State no longer holds title to that property, and is not a party to this case. Appellant does not make clear how the State's alleged acquisition of title affects the analysis of adverse possession, beyond the proposition elucidated in *Lippert:* a tax sale purchaser obtains a newly-minted title, free of earlier encumbrances.

easement to utilize [appellant's] waterfront property....
The tax sale deed to Dr. Sahandy does not state that the
particular right to use the disputed property is being con-
veyed. It only states that any rights enjoyed by [621
Tayman Drive] are conveyed. If such a right of easement
exists, there is nothing in that easement which gives to Dr.
Sahandy any claim of *title* to [appellant's] shoreline proper-
ty.

"As to the first claim, which is whether [appellant] retains
title," appellees argue that "the tax sale has absolutely no
effect. Since the property Dr. Sahandy purchased [at the tax
sale] has no claim of title to the waterfront deeded to [appel-
lant], there can be no defense by [appellant] to the adverse
possession claim on the basis of the tax sale deed." As to the
second claim, appellees acknowledge that, "if a right of use
passed with the tax sale deed, Dr. Sahandy could assert that
his right to utilize the waterfront adjacent to the Singleton
and Hertz properties has not been lost by adverse possession."
But, appellees insist that "[t]his protection is only granted to
Dr. Sahandy as the purchaser of the tax sale property. It was
not granted by the tax sale deed either to [appellant] or to the
[other] lot owners in [the Subdivision]."

Appellees continue:

Dr. Sahandy has no obligation to preclude a claim by
Singleton and Hertz. In fact, here, the Singletons, and the
Hertzes have joined together to bring this claim, and there
is no claim by Singleton or Hertz against Dr. Sahandy to
adjudicate.

What [appellant] asks is that this Court extend whatever
rights Dr. Sahandy received under the tax sale deed to
every member of the community and to [appellant], even
though none of them purchased a tax sale property. That
is, [appellant] claims that the tax sale statute protects not
only Dr. Sahandy as the purchaser of the property, but
every other person in [the Subdivision]. Nothing in *Lippert
v. Jung* or in the tax sale law would support such a finding.

To be sure, the fact that Sahandy is simultaneously an adverse possessor of one property and the tax sale purchaser of another property constitutes an unusual circumstance. Nevertheless, there are two significant differences between this case and *Lippert* that render appellant's position unavailing.

The first, and most significant, is that 621 Tayman Drive is not the property that appellees claim to have adversely possessed. The disputed area and the tax sale property are completely distinct parcels. In contrast, they were one and the same in *Lippert*. When Sahandy purchased 621 Tayman Drive, he did not acquire any interest in the title to the Community Beach as a whole or the disputed portions of it. Moreover, the *Lippert* Court was not presented with the question of whether easement rights that benefit the property sold at a tax sale survive the creation of the new title. Nor have we found any Maryland cases that address the question. But, assuming that the easement rights benefitting 621 Tayman Drive survived the creation of a new title in connection with the tax sale, as they would in an ordinary sale between private parties, *cf. Goss v. C.A.N. Wildlife Trust, Inc.*, 157 Md.App. 447, 460, 852 A.2d 996 (2004) ("an easement established for benefit of a particular tract of land is an 'appurtenant right' that passes with ownership of the benefited tract"), Sahandy acquired, at most, only the rights that appertained to 621 Tayman Drive. This would be the easement rights to use and enjoy the Community Beach in common with every other property owner in the Subdivision.

We need not determine, however, whether the easement rights pertaining to 621 Tayman Drive survived the tax sale, because of the second important distinction between this case and *Lippert:* the tax sale purchaser was Sahandy, rather than appellant or any other lot owner in the Subdivision. Even if the tax sale purchaser of 621 Tayman Drive retained an assertable easement right to use the disputed properties, notwithstanding appellees' adverse possession, Sahandy was the tax sale purchaser, and he has not asserted any such right. Although Sahandy's wishes do not control whether adverse

possession cuts off his rights as owner of 621 Tayman Drive, his wishes certainly control whether he will assert those rights. Put another way, Sahandy is a plaintiff, not a defendant, in this action, and he has not raised the question of whether he retains easement rights over the disputed properties behind his co-plaintiffs' lots.

Appellant has cited no authority for the proposition that Sahandy's putative easement rights as the owner of 621 Tayman Drive inure to appellant's benefit or the benefit of the other lot owners in the Subdivision. Nor has appellant cited any authority for the proposition that appellant can assert such rights independent of Sahandy.[19] Accordingly, we reject appellant's assertion that appellees' adverse possession of the disputed properties was cut off by the tax sale of 621 Tayman Drive.

### F. Sovereign Immunity

■ Next, appellant points to its status, since 1965, as administrator of the Hillsmere Estates Special Community Benefit District, pursuant to the County Code; the District consists of the Subdivision. Hillsmere extrapolates from its status that the Association is "a State agency" and, on that basis, it contends that it is "immune from claims of adverse possession regardless of the manner or purpose for which [it] hold[s] title to the property." In support of its position, appellant relies on Article 26 of the Maryland Annotated Code (1957, 2007 Supp.), contending that a special community benefits district is a "special tax district" that meets the requirements to qualify as a "governmental entity."[20]

In relevant part, Article 26 provides:

### § 1. Definitions.

---

**19.** Notably, after our prior remand in *Hillsmere I,* no other landowners in the Subdivision joined the suit to assert such easement rights.

**20.** For a discussion of special community benefit districts, *see, e.g., Williams v. Anne Arundel County,* 334 Md. 109, 117–18, 638 A.2d 74 (1994); *Barlow v. Friendship Heights Citizens' Comm.,* 276 Md. 89, 92, 344 A.2d 415 (1975).

(a) *In general.*—For the purposes of this article the following words have the meanings indicated.

(b) *Governmental entity.*—"Governmental entity" means a special taxing district which:

(1) Is a unit of government responsible for an area situated solely within a single county;

(2) Has a governing body elected independently of the county government;

(3) Is financed with revenues secured in whole or in part from special taxes or assessments levied on real property situated within the area;

(4) Performs municipal services for the residents of the area; and

(5) Was not created for a limited or special purpose or purposes....

To be sure, under Article 26 the officials of a "governmental entity" are entitled to immunity from civil liability for any act or omission, "while acting in a discretionary capacity, without malice, and within the scope of the official's authority...." C.J. § 5–511(b). *See also* Md. Ann.Code, Art. 26, § 2 ("Officials of a governmental entity shall have the immunity from liability described under [C.J.] § 5–511....").

Characterizing appellant's argument as appellant's "greatest leap of logic," and a "blatant misstatement of the law ....," appellees posit: "Article 26 does not provide sovereign immunity from adverse possession." They also assert: "There is a substantial question as to whether [the Subdivision] is even a 'special tax district' as defined in [Article 26]." Further, appellees note that Article 26 and C.J. § 5–511 provide immunity from suit for *officials* of governmental entities, not the governmental entities themselves. In appellees' view, the immunity granted under those provisions "is not an immunity for an Association or from the effect of [C.J. § ] 5–103 ... applying to the adverse possession of land." Finally, appellees maintain that,

if property is held by a governmental entity, but the property was not dedicated to public use, it can be adversely

possessed. . . . Since there is no dedication to public use, even if the Special Taxing District is considered a Municipal Corporation, or Quasi Municipal Corporation, HSIA's property is not public property protected from claims by adverse possession.

In this regard, appellees note that, by the express terms of the 1965 Deed and Agreement, the Community Beach is reserved only "for the use and benefit of all Hillsmere lot owners," and is not dedicated to the use of the general public. They cite *Washington Land Co. v. Potomac Ridge Dev. Corp.,* 137 Md.App. 33, 54, 767 A.2d 891 (2001), for the proposition that, to constitute a public use, the property right "must be conferred upon and exercisable by the public *at large,* and not merely a portion of it, **such as the property owners living within a particular subdivision.**" (italics in original; boldface added). They also rely on *City of Annapolis v. Waterman,* 357 Md. 484, 506, 745 A.2d 1000 (2000).

In resolving this issue, the circuit court relied on *Washington Land.* It concluded that the Community Beach "is dedicated to a particular set of property owners and therefore could never be protected by the immunity enjoyed by some government properties."

At the outset, we reject appellant's assertion that it is a "State agency." In *Zimmer–Rubert v. Bd. of Educ. of Baltimore County,* 179 Md.App. 589, 947 A.2d 135 (2008), *cert. granted,* 405 Md. 505, 954 A.2d 467 (2008), this Court recently reiterated the distinction, in the context of sovereign immunity, between a State agency and a political subdivision of the State, such as a county or a municipality.[21] In determining

---

**21.** The *Zimmer–Rubert* Court dealt with the distinction between a State agency and a county or municipality in the context of the Eleventh Amendment to the federal Constitution, which "applies only to 'one of the United States' and 'does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a "slice of state power."'" *Zimmer–Rubert,* 179 Md. App. at 596, 947 A.2d 135 (quoting *Ram Ditta v. Md. Nat'l Cap. Park & Planning Comm'n,* 822 F.2d 456, 457 (4th Cir.1987)). *See also Norville v. Anne Arundel County Bd. of Educ.,* 160 Md.App. 12, 862 A.2d 477

that a county board of education is a State agency, the *Zimmer–Rubert* Court applied a three-pronged test: " '(1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (2) the scope of the entity's concerns—whether local or state-wide—with which the entity is involved; and (3) the manner in which State law treats the entity.' " *Id.* at 596, 947 A.2d 135 (citation omitted).

Applying that test to the case at bar, it is apparent that (1) the State does not control appellant in any meaningful way;[22] (2) the scope of appellant's concerns are entirely limited to the Subdivision; and (3) although State law may provide officials of HSIA with immunity from suit, that is the extent of State law treatment of the Association that appellant has alleged. It is no more extensive than the immunity granted to the officials of counties or municipalities. *See* C.J. § 5–507(b)(1) (immunity of officials of municipal corporations). Thus, we conclude that Hillsmere is not a State agency.

This distinction is relevant because, as the Court explained in *Central Collection Unit v. Atlantic Container Line, Ltd.*, 277 Md. 626, 629, 356 A.2d 555 (1976) (internal citations omitted): "In Maryland, there has never been any doubt that adverse possession does not run against the State. However, the rule, as applied to political subdivisions, is ordinarily limited to land held in a governmental capacity or for public use." *See Desch v. Knox*, 253 Md. 307, 312, 252 A.2d 815 (1969); *City of Baltimore v. Chesapeake Marine Ry. Co.*, 233 Md. 559, 572, 197 A.2d 821 (1964); *Bond v. Murray*, 118 Md.

---

(2004) (holding that the Anne Arundel Board of Education is an arm of the State for purposes of Eleventh Amendment immunity), *vacated on other grounds*, 390 Md. 93, 887 A.2d 1029 (2005). Nevertheless, we find the analysis employed in *Zimmer–Rubert* instructive as to the question of immunity from adverse possession, as the critical distinction in both contexts is between a State or State agency on the one hand, and a county or municipality on the other.

22. Obviously, appellant is subject to various State laws, as are other corporate entities. But, in our view, that does not constitute "control" within the meaning of the test.

445, 452–53, 84 A. 655 (1912); *Hall v. Gittings*, 2 H. & J. 112, 114 (1806).

 Because appellant is not a State agency, appellant's ability to claim immunity from adverse possession, if any, is limited to the immunity enjoyed by a municipality or other political subdivision. The Court of Appeals elucidated this limited immunity in *Siejack v. Mayor and City of Baltimore*, 270 Md. 640, 313 A.2d 843 (1974).

In *Siejack*, the parties contested title a parcel of land in Baltimore County. *Id.* at 641, 313 A.2d 843. The City claimed record title while Siejack claimed title, *inter alia*, by adverse possession. *Id.* The Court first clarified that Maryland adheres to "the rule that title to property held by a municipal corporation in its government capacity, for a public use, cannot be acquired by adverse possession." *Id.* at 644, 313 A.2d 843; *accord Mauck v. Bailey*, 247 Md. 434, 443, 231 A.2d 685 (1967) ("[D]edicated property cannot subsequently be acquired by adverse possession"); *Messersmith v. Mayor and Common Council of Riverdale*, 223 Md. 323, 328, 164 A.2d 523 (1960) ("[P]roperty held as a public trust may not be privately acquired by adverse possession"); *Farrell v. Phillips*, 94 Md.App. 152, 156, 616 A.2d 437 (1992) ("Where an offer of dedication of property is accepted by the public, the dedicated property cannot later be acquired by adverse possession"). But, the *Siejack* Court was satisfied that the evidence was "sufficient to rebut any notion that the City had ever devoted [the property] to public use." 270 Md. at 645, 313 A.2d 843.

 Under the rule announced in *Siejack*, a municipal corporation that holds title to property in its governmental capacity, for public use, is immune from divestiture of title by adverse possession. Thus, in order for us to conclude here that the court erred in granting title by adverse possession, we would have to conclude that appellant (1) is a municipal corporation, (2) holds title to the Community Beach in its governmental capacity, and (3) holds title to the Community Beach for a public use.

Assuming, without deciding, that appellant meets the first two requirements for immunity from divestiture of title by adverse possession, as announced in *Siejack* (*i.e.*, that it constitutes a municipal corporation and that it holds title to the Community Beach in a governmental capacity), we are satisfied that the Community Beach is not property dedicated to "public use" as defined by Maryland law. And, as noted, "municipal property not devoted to a public use" can be acquired by adverse possession. *Siejack*, 270 Md. at 644, 313 A.2d 843; *see Read v. Montgomery County*, 101 Md.App. 62, 71, 643 A.2d 476 (1994) ("[T]he law in Maryland permits adverse possession against municipal property not devoted to a public use").

As appellees observe, in order for property to be dedicated for public use, it "must be conferred upon and exercisable by the public *at large*, and not merely a portion of it, <u>such as the property owners living within a particular subdivision</u>." *Washington Land Co., supra*, 137 Md.App. at 54, 767 A.2d 891 (underline added; italics in original); *see also Waterman, supra*, 357 Md. at 506, 745 A.2d 1000 ("The recreational area condition on appellees' subdivision request does not constitute a dedication because the proposed recreational space is not for general public use; it is intended only for the use of those residing within the ... development."); *Bonds v. Royal Plaza Cmty. Associates, Inc.*, 160 Md.App. 445, 458, 864 A.2d 257 (2004) (stating that "the **public** must be a party to every dedication.... *[R]eal property cannot be* **dedicated** *to a homeowners association.*") (Italics added); *Gregg Neck Yacht Club v. County Comm'rs of Kent County*, 137 Md.App. 732, 756–57, 769 A.2d 982 (2001).

Even if appellant constitutes a municipal corporation, the Developer's conveyance of the Community Beach to appellant was not a dedication to the public. Pursuant to the first restriction of the Deed and Agreement, the Community Beach was conveyed to "be used and maintained exclusively and solely as a beach, boat park and recreational area and for no other use ... by [appellant] for itself and all lot owners,

*however, to be limited to lot owners of land within the boundaries of that area designated as 'Hillsmere Estates'...."* (Emphasis added.) Consequently, the recreational area condition contained in the Deed and Agreement "does not constitute a dedication because the proposed recreational space is not for general public use; it is intended only for the use of those residing within" the Subdivision. *Waterman,* 357 Md. at 506, 745 A.2d 1000. Accordingly, the circuit court was correct in concluding that appellant is not entitled to protection from adverse possession.

## G. Effect of County Code Provisions on Adverse Possession

In its final two contentions, appellant claims that certain provisions of the County Code effectively limit the doctrine of adverse possession with respect to property such as the Community Beach. On this basis, appellant claims that neither appellees nor anyone else can ever claim title to a portion of such land by adverse possession. Hillsmere cites no case law in support of its contentions.

Appellant notes that in Maryland, pursuant to the Express Powers Act, Md. Ann.Code (1957, 2007 Supp.), Art. 25A, § 5(X), charter counties such as Anne Arundel County have "broad and extensive authority ... to create zoning and planning ordinances to ensure the orderly development of land within the County...." Appellant suggests that "[t]he relevant subdivision laws in Anne Arundel County forbid the resubdivision of an existing lot without first complying with the Anne Arundel County subdivision law," and insists that the County's subdivision ordinances, which impose a regulatory regime upon the "subdivision" of land, "properly limit[ ] the application of Adverse Possession" by providing that "if Adverse Possession is to effectuate a change in title, then the entire parcel or lot must be possessed." Because appellees claim only a portion of the Community Beach, appellant argues that appellees "have illegally subdivided the lot," and thus their adverse possession claim cannot succeed.

Appellees characterize appellant's contention as a "creative argument" that is "based on a complete misreading of the statutory scheme." They argue that the County ordinances cited by appellant are, by their text, "entirely related to use" of the property, not change of title. Moreover, appellees argue that their adverse possession does not "subdivide" the Community Beach within the meaning of the applicable statutes, because "even though part of the ... property is lost to the Appellant, it is added to the Appellees' properties, so no new lots or sites are created. There is merely an involuntary change of lot line."

In rejecting appellant's arguments, the circuit court cited "[r]eported cases involving pieces of property in Anne Arundel County that have been divided into smaller lots through the action of adverse possession," including *Freed v. Cloverlea Citizens Ass'n*, 246 Md. 288, 228 A.2d 421 (1967), and *Peters v. Staubitz*, 64 Md.App. 639, 498 A.2d 661 (1985), as "demonstrat[ing] that restrictions on subdivision in [the] County are not a bar to adverse possession." In these cases, however, the appellate courts were not presented with the argument advanced by appellant.

Our research has disclosed no Maryland cases, and only one decision of a foreign jurisdiction, *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998), in which arguments similar to appellant's were addressed.[23] In *Wanha*, the Supreme Court of Nebraska considered whether "platted and subdivided land within a municipality cannot be adversely possessed," under a Nebraska statute which forbade certain owners of real estate " 'to subdivide, plat, or lay out said real estate ... without first having obtained the approval thereof' " by relevant local

---

23. In one other case, *Evanich v. Bridge*, 170 Ohio App.3d 653, 868 N.E.2d 747 (2007), a litigant contended on appeal that a trial court "erred in not determining that public policy considerations precluded application of the adverse-possession doctrine to statutorily platted residential subdivisions." *Id.* at 752. The appellate court rejected the proposition without reaching the merits, however, because the litigant had not raised the issue in an earlier appeal, and was therefore "barred from raising this argument on appeal, after remand, by the doctrine of res judicata." *Id.*

authorities. *Id.* at 542 (quoting Neb.Rev.Stat. § 14–116). The Nebraska court rejected the argument, determining that the statute had "no application to the doctrine of adverse possession and is not in conflict with it." *Id.* at 543. The court reasoned that the source of an adverse possessor's title is " '[h]is own possession,' " rather than " 'a transfer or grant by operation of law from the former title holder,' " *id.* at 542–43 (citation omitted), and thus that, once the statutory period has run, "there is nothing left for the adverse possessor to do to gain title, i.e., no application to . . . any . . . authority need be made. . . ." *Id.* at 543. Moreover, the court observed that, "[b]y its own language, [the state statute] applies only to the subdivision of property by its owner." *Id.* Therefore, the court reasoned that "an adverse possessor need not make any such application prior to the running of the period of limitations," because "[u]ntil the period of limitations has run, the adverse possessor does not own the property that is being adversely possessed." *Id.*

 In this case, there is an even more fundamental difficulty with appellant's position than there was in *Wanha,* because the enactment upon which Hillsmere relies is a County ordinance rather than a State statute. Even if the ordinances that appellant cites applied by their terms to an adverse possession claim, there would be a significant question whether a County ordinance could affect the operation of adverse possession. The doctrine is, at root, a matter of State statute. In Maryland, as in other jurisdictions, the doctrine of adverse possession is the outgrowth of a "statute[ ] of limitations that fix[es] the period of time beyond which the owner of land can no longer bring an action, or undertake self-help, for the recovery of land from another person in possession." RICHARD R. POWELL & MICHAEL ALLAN WOLF, 16 POWELL ON REAL PROPERTY § 91.01 at 91–4 (2000, 2007 Supp.). The statute is "complemented and amplified by a large body of case law that elaborates on the kind of possession by another that is sufficient to cause the statutory period to begin to run, and to continue running, against the true owner." *Id.* In sum, "the law of adverse possession is a synthesis of statutory

and decisional law," rather than purely a matter of judicially-developed common law. *Id.*[24]

The legal authority for an adverse possessor to obtain title to land derives from State statutory law. In particular, adverse possession is governed by C.J. § 5–103(a), which, as noted, provides a twenty-year statute of limitations to cut short an adverse possession claim, either by "[f]il[ing] an action for recovery of possession of … a leasehold estate in land," or "[e]nter[ing] on the land," and by R.P. § 14–108, which provides an adverse possessor with a cause of action to quiet title, i.e., to affirmatively obtain clear title to the adversely possessed land after the statutory period has run. R.P. § 14–108 provides, in part: "Any person in actual peaceable possession of property … either under color of title or claim of right by reason of his or his predecessor's adverse possession for the statutory period … may maintain a suit in equity … to quiet or remove any cloud from the title, or determine any adverse claim."

If the text of the County ordinances cited by appellant in fact conflict with R.P. § 14–108 and C.J. § 5–103, as appellant contends, the question would arise whether the grant of authority to the County under the Express Powers Act to "enact local laws … related to zoning and planning," Md. Ann.Code 1957, Art. 25A, § 5(X), authorized the County to supplant State statutory law in this regard. We need not address that question, however, because, even assuming that

---

**24.** In Maryland, the original source of the adverse possession doctrine was the Limitation Act of 1623, 21 James I, c. 16, an English statute which required that suits to recover ownership of land by the title holder "shall be sued and taken within Twentie yeares next after the Title and Cause of Accion first descended or fallen, and at no tyme after the said Twentie yeares." 4 STATUTES OF THE REALM 1222–23 (1713). *See Safe Deposit & Trust Co. of Baltimore v. Marburg,* 110 Md. 410, 414–15, 72 A. 839 (1909) (discussing the Limitation Act as the origin of the State statute of limitations for actions to recover possession of land, and recounting various enactments of the General Assembly "which have changed that statute and which prescribe the kind of evidence required to establish adverse possession"). The Limitation Act is no longer in effect in Maryland. *See* R.P. § 14–115 (repealing enumerated British statutes, including 21 James I, ch. 16).

the Express Powers Act grants the County the power to restrict the doctrine of adverse possession by ordinance, the County has not exercised that power. As in *Wanha,* the ordinances cited by appellant, by their own text, present no conflict with the doctrine of adverse possession. We explain.

At present, the County's ordinances pertaining to subdivision are codified in Article 17 of the County Code (2005, Mar. 2008 S–17 Supp.), and apply "to all land located in the County." *Id.,* § 17–2–101(a). Article 17 details a regulatory scheme requiring several layers of County review of proposals for subdivision. *See generally id.,* §§ 17–3–101 *et seq.* Under the present Article 17, "subdivision" means *"the division of land so as to create two or more lots,* the revision of a record plat previously approved by the County, or the establishment of a record plat for land not shown on a record plat previously approved by the County." *Id.,* § 17–1–101(60) (emphasis added). In turn, a "lot" is defined as *"land described in a record plat* [*or deed*] and recorded in the land records of the County in accordance with the laws in effect at the time of recordation. . . ." *Id.,* § 17–1–101(43) (emphasis added).

In rejecting appellant's contention, the circuit court opined: "[A]dverse possession does not meet the definition of subdivision found in Article 17 § 1–101(60) of the Anne Arundel County Code because it does not divide land by deed as defined in Article 17 § 1–101(43)." We agree with the circuit court. Adverse possession of real property is achieved by occupying it for the statutory period, not by the recordation of a deed or plat in the County land records. Accordingly, adverse possession is not "subdivision" within the meaning of the County Code. Moreover, subject to exceptions not applicable here, County Code § 17–2–106 provides: "The owner of contiguous properties may consolidate the properties by deed without initiating subdivision. . . ." Thus, we do not perceive the present County Code to affect appellees' ability to adversely possess the disputed properties.

Appellant looks to earlier versions of the County Code as the source of applicable law, however. The present Article 17

was enacted in 2005, during the pendency of this case, by Laws of Anne Arundel County, Bill 3–05. Before that time, subdivision of land in the County was governed by Article 26 of the Anne Arundel County Code (1985, as amended), which, in turn, contained a grandfather clause that provided that Article 26 of the County Code did "not apply to a lot shown on a subdivision plat recorded among the land records of the County on or before January 15, 1970, if the lot was sold on or before January 15, 1971. . . ." *Id.*, Art. 26, § 1–105(b). Instead, such grandfathered lots, including the lots in the Subdivision at issue, were required to "comply with the ordinances, regulations, and requirements in use or in effect on November 1, 1969." *Id.*, Art. 26, § 1–106.

Appellant contends: "The Anne Arundel County ordinances, in effect on November 1, 1969, and continuing in effect throughout the entire time of disputed possession . . . forbid any lot or parcel of ground from being divided without going through the subdivision process." Yet, appellant cites provisions of the County Code that were not in effect on November 1, 1969. The ordinances cited by appellant, found in Article 13 of the County Code (1967, as amended), are provisions of Laws of Anne Arundel County, Bill 76–69. Bill 76–69 was enacted on December 1, 1969, and did not take effect until January 15, 1970. *See* Laws of Anne Arundel County, Bill 76–69, § 8 ("[T]his Ordinance shall take effect forty-five (45) days from [December 1, 1969]."). Bill 76–69 is, in fact, the source of the grandfather clause cited by appellant.[25] Its provisions were not effective on November 1, 1969.

Rather, the Anne Arundel County ordinances in effect on November 1, 1969, were codified in Chapter 32 of the County Code (1957, 1961 Supp.). As we see it, appellant's argument fares just as poorly under that enactment as it does under the present County Code. Under the County Code in effect on November 1, 1969, "subdivision" was defined as "[t]he division

---

25. The grandfather provisions of Bill 76–69 were originally codified at § 13–104.2 of the County Code (1967, as amended), and later recodified at Art. 26, §§ 1–105(b) & 1–106 of the County Code (1985, as amended).

of any tract or parcel of land ... into two or more lots, plots or other divisions of land, *for the purpose, whether immediate or future, of building development for rental or sale....*" County Code (1957, 1961 Supp.), § 32–1 (emphasis added). Patently, appellees' adverse possession of the disputed properties was not undertaken "for the purpose ... of building development for rental or sale." Thus, their adverse possession does not qualify as "subdivision" under the County Code as it existed on November 1, 1969, any more than it does under the present County Code.

 Appellant also argues that specific provisions of the County's subdivision ordinances with respect to "recreational areas" apply to the Community Beach and prohibit an entity, other than a community association like appellant, or the County itself, from holding title to such a recreational area. In this regard, appellant again cites provisions of Laws of Anne Arundel County, Bill 76–69, which explicitly do not apply to the properties at issue because of the grandfather clause contained in that ordinance. The relevant ordinances in effect with regard to the disputed properties were County Code (1957, 1961 Supp.), §§ 32–21 & 32–23. They provided:

**Sec. 32–21. Compliance required.**

In laying out a subdivision, the subdivider shall comply with the principles and requirements set out in this article.

\* \* \*

**Sec. 32–23. [Layout]—Reservation of recreational space.**

Where held appropriate by the planning and zoning commission, open spaces suitably located and of adequate size for parks, playgrounds or other recreational purposes for local or neighborhood use shall be provided for in the design of the proposed subdivision; and, if not dedicated to the public or conveyed to the board of county commissioners, shall be reserved for the common use of all property owners in the proposed subdivision by covenant in the deeds. This shall normally be considered to be about five per cent of the gross area of the subdivision....

Appellees note that the plat of Section 1 of the Subdivision, in which appellees' properties and the Community Beach are located, is dated April 22, 1952, and was recorded in the Land Records of Anne Arundel County on May 28, 1952. They argue that the plat's "recordation date was two months in advance of the adoption of the first subdivision regulations in Anne Arundel County, which were adopted on July 1, 1952." "In other words," appellees explain, "there were *no* subdivision regulations in effect at the time of the recording of the plat."[26] Appellees argue that the subdivision regulations of the County Code requiring reservation of recreational space are "requirement[s] in order *to obtain* a subdivision, and do[ ] not apply to subdivisions which already existed when the law was passed."

We agree with appellees. The requirement for reservation of recreational space under County Code (1957, 1961 Supp.), § 32–21 applied "[i]n laying out a subdivision," and indicated that the recreational space "shall be reserved for the common use of all property owners in the proposed subdivision *by covenant in the deeds." Id.,* § 32–23 (emphasis added). This language plainly was applicable to a developer's creation of a subdivision. As appellees note, in this case the Developer created Section 1 of the Subdivision before the relevant Coun-

---

**26.** In support of their contention that the first "subdivision regulations" in the County were adopted on July 1, 1952, appellees cite *Zang & Sons Builders, Inc. v. Taylor,* 203 Md. 628, 102 A.2d 723 (1954), and *Didlake v. Poteet,* 228 Md. 588, 180 A.2d 828 (1962). The cited cases, however, refer to "a new *zoning plan* for the County [which] became effective July 1, 1952," *Zang,* 203 Md. at 630, 102 A.2d 723 (emphasis added), rather than subdivision regulations. *See also Didlake,* 228 Md. at 590, 180 A.2d 828 ("[T]he Board of County Commissioners of Anne Arundel County, on July 1, 1952, established a comprehensive zoning plan for Anne Arundel County. . . ."). Our research indicates that the pertinent subdivision regulations were not enacted until July 14, 1953. *See* County Code (1957, 1961 Supp.), §§ 32–1 to–23 (all enacted by ordinance of "7–14–53"). *See also Delbrook Homes, Inc. v. Mayers,* 248 Md. 80, 91, 234 A.2d 880 (1967) (Barnes, J. dissenting) (citing the code provisions of Chapter 32 of the County Code as "used in the ordinance of July 14, 1953"). Nevertheless, appellees' point—that the County regulations were not in effect when Section 1 of the Subdivision was created—remains valid.

**734**

ty Code provisions were enacted. Moreover, as already discussed, appellees' adverse possession of the disputed properties does not qualify as "subdivision" under the County Code.

Accordingly, we conclude that the provisions of the County Code do not limit appellees' ability to obtain title to the disputed properties by adverse possession.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

EXHIBITS